Heather LEEPER n/k/a Heather Haiar, and Hillary Woods, Plaintiffs–Respondents,

v.

SCORPIO SUPPLY IV, LLC, d/b/a NAPA Auto Parts of Joplin, Scorpio Supply III, LLC, d/b/a NAPA Auto Parts of Monett, and James Entrikin, Defendants,

and

Alvin Briscoe, Defendant–Appellant.

No. SD 29686.

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 2, 2011.

Motion for Rehearing or Reconsideration and Transfer Denied Sept. 26, 2011.

Application for Transfer Denied Dec. 6, 2011.

Jessica M. Bernard, Overland Park, KS, for Appellants.

Tammy L. Horn, Overland Park, KS, for Respondents.

JEFFREY W. BATES, Presiding Judge.

Heather Leeper and Hillary Woods (hereinafter referred to individually by surname and collectively as Plaintiffs) brought suit against Scorpio Supply IV, LLC d/b/a NAPA Auto Parts of Joplin (Joplin NAPA); Scorpio Supply III, LLC d/b/a NAPA Auto Parts of Monett (Monett NAPA); James Entrikin (Entrikin); and Alvin Briscoe (Briscoe). The multi-count petition included a Missouri Human Rights Act (MHRA) claim by each plaintiff based upon sexual harassment resulting in a hostile work environment. *See* §§ 213.010–.137.[1] Plaintiffs' hostile work environment claims were tried to a jury, which found in their favor and awarded them compensatory and punitive damages, attorney's fees and costs. Only Briscoe has appealed from the judgment. He contends that the trial court erred by: (1) imposing vicarious liability on him for sexual harassment committed by his supervisory employee; (2) giving a verdict-directing instruction that imposed a nonexistent legal duty on him; and (3) submitting his liability for punitive damages to the jury. Finding no merit in

Briscoe's contentions, we affirm the trial court's judgment.

*Point I*

In Briscoe's first point, he contends the trial court erred in denying his motion for directed verdict at the close of all of the evidence and his motion for judgment notwithstanding the verdict (JNOV) because he could not be held vicariously liable for sexual harassment committed by his supervisory employee. Our review of the trial court's denial of a motion for a directed verdict and a motion for JNOV is essentially the same. *Hadley v. Burton,* 265 S.W.3d 361, 374 (Mo.App.2008). Our task is to determine whether Plaintiffs made a submissible case against Briscoe. *See id.* "A directed verdict is a drastic action to be taken sparingly and only where reasonable persons in an honest and impartial exercise in their duty could not differ on a correct disposition of the case." *Oak Bluff Partners, Inc. v. Meyer,* 3 S.W.3d 777, 783 (Mo. banc 1999). "If the facts are such that reasonable minds could draw differing conclusions, the issue becomes a question for the jury, and a directed verdict is improper." *Lasky v. Union Elec. Co.,* 936 S.W.2d 797, 801 (Mo. banc 1997). An appellate court will only reverse a jury's verdict for insufficient evidence when there is a complete absence of probative facts to support the jury's conclusion. *Giddens v. Kansas City Southern Ry. Co.,* 29 S.W.3d 813, 818 (Mo. banc 2000). On appeal, we view the evidence and reasonable inferences therefrom in the light most favorable to Plaintiffs, the prevailing parties; all contrary evidence and inferences are disregarded. *See D.R. Sherry Constr., Ltd. v. American Family Mut. Ins. Co.,* 316 S.W.3d 899, 907 (Mo. banc 2010);

1. All references to statutes are to RSMo (2000). All references to rules are to Missouri Court Rules (2010).

*Hadley*, 265 S.W.3d at 374. Our summary of the evidence has been prepared in accordance with these principles.

Briscoe owned and operated NAPA auto parts stores in Joplin, Monett, Nevada and Butler, Missouri. Briscoe set up a limited liability company (LLC) to operate each store. He was the sole managing member of each LLC and was actively involved in the operation of each store. He personally hired the sales manager, who was in charge of the overall operations of all four stores, as well as the manager and assistant manager for each individual store. He sometimes was involved in the hiring of other, lower-level employees at various stores. Each individual store had eight to ten employees, depending on sales volume. Entrikin was hired as the sales manager, and his immediate supervisor was Briscoe. They had known each other for 30 years and were very close. Entrikin lived in a house that he rented from Briscoe.

### Leeper's Employment at Monett NAPA and Joplin NAPA

Leeper began working at Monett NAPA in March 2005 when she was 28 years old. She worked as a delivery driver and counter person. She sometimes performed the same duties at Joplin NAPA. There was no policy in place at either store to prevent sexual harassment. Neither managers nor employees received any training or education on what type of behavior was appropriate for the workplace. Employees were not given any education or training about who was to receive complaints about inappropriate behavior or how to report such occurrences.

In the summer of 2005, Jason Hardwick (Hardwick) was the manager of Monett NAPA. Leeper was in a back room getting something from a shelf when Hardwick came up behind her and rubbed his penis against her buttocks. Leeper reported the incident to Entrikin, who was Hardwick's immediate supervisor. Entrikin's only response was to tell Leeper that she needed to watch how she behaved. Hardwick was not disciplined for what he had done. No record of this incident was placed in Hardwick's personnel file.

Thereafter, Hardwick was fired for theft. Entrikin told Leeper that he finally would get a chance with her because Hardwick was gone. Entrikin started making crude, sexually offensive comments to Leeper. Entrikin would whisper things in her ear like, "I want to fuck you" and "I wouldn't mind getting a piece of . . . [your] rear end." When Leeper was leaving the store to go home for lunch, Entrikin would offer to go with her and say "an hour would be long enough to get some action." He would call her when she was at home. While staring at Leeper's crotch, Entrikin would say that he was hungry and move his tongue in a manner suggestive of oral sex. When Entrikin stayed in a hotel, he would give his room number to Leeper and ask if she was coming over that night. She would make excuses for not doing so because she was afraid of losing her job.

Entrikin began following Leeper around the store. When Leeper went to the restroom, Entrikin would stand outside and jiggle the door handle. He started touching Leeper inappropriately. He would massage her shoulders and then run his hands over her breasts when no other employees were around. When he was sitting in a chair, he would grab her by the waist and pull her down onto his lap. After making sure that Leeper was watching him, he would pretend to unzip his zipper. On numerous occasions, he would make gestures using his tongue and hands to simulate oral sex.

Entrikin's actions became more aggressive over time. On one occasion, he reached inside Leeper's shirt and squeezed

her breasts. On another occasion, he pulled her into a bathroom and stuck his hand down the front of her pants. She was afraid he intended to rape her. On a third occasion, Entrikin grabbed Leeper's hand and made her touch his penis.

Entrikin's behavior created a hostile and intimidating work place for Leeper. This behavior continued for 10 or 11 months. Because Entrikin was the immediate supervisor of all of the store managers, Leeper did not know who she should tell about his behavior or what procedures to follow. She knew that Briscoe and Entrikin were really close friends, and she believed she would get in trouble if she said anything.

*Woods' Employment at Joplin NAPA*

Woods began working at Joplin NAPA in August 2005 when she was 20 years old. She was hired by store manager David Vandiver. Woods worked full-time as a parts delivery driver. When not making deliveries, she stocked parts, worked the counter, answered the phone and did paperwork.

In December 2005, Vandiver was fired. Entrikin became the temporary store manager for Joplin NAPA and Woods' immediate boss. While Entrikin was acting as store manager at Joplin NAPA, he often stayed at a motel instead of driving home to Rich Hill, Missouri. When he did so, he would give Woods the motel room number and ask her to come by in the evening if she was interested. Woods realized that Entrikin wanted a sexual relationship with her.

Woods intended to go to college, but her full-time position as a driver interfered with day classes. In January 2006, Woods moved to the counter. This allowed her to take morning classes and still work from 11:00 a.m. to 7:00 p.m. at the store. Entrikin began asking Woods to go to lunch with him two or three times each week. No other employees were invited to these lunches. Initially, Woods and Entrikin engaged in friendly conversations about matters other than work. Beginning in February 2006, Entrikin began calling these lunches "Hillary days[.]" Entrikin said that Woods looked stressed and needed to go to lunch with him to relax. Over time, the nature of the conversations changed from casual to personal. Entrikin was very interested in Woods' relationship with her boyfriend. Entrikin also complained about his wife and said he had considered leaving her. The lunches began to last as long as two hours, although Woods was only allowed one hour for lunch. When she mentioned this to Entrikin, he told her not to worry about it. Her paychecks were adjusted to show that she had only taken one hour for lunch. When Woods tried to talk about work during the lunches, Entrikin would steer the conversation back to personal matters like Woods' relationship with her boyfriend and Entrikin's relationship with his wife. Between February and June 2006, Woods had lunch with Entrikin 50 to 60 times.

During this same time frame, Entrikin began following Woods around in the store. Besides Entrikin, Woods was the only employee there between 5:00 p.m. and 7:00 p.m. when the store closed. Wherever Woods went in the store, Entrikin would find something to do nearby. He even followed Woods to the bathroom and jiggled the doorknob while she was inside. Entrikin made comments about how nicely Woods' pants fit her. He would motion to Woods and pretend to unzip the zipper on his jeans. He would flick his tongue to simulate oral sex. He began touching Woods at work during the evenings when no other employees were present. At first, Entrikin just rubbed Woods' shoulders and offered to brush her hair. Later,

he grabbed at Woods' hips and pulled her down onto his lap. He touched her buttocks with his hands on several occasions. Scared and ashamed of what was happening, Woods made it clear to Entrikin that his conduct was unwelcome. Despite that, Entrikin's advances continued. He tried to kiss Woods approximately 20 times. She would turn her head away to keep it from happening. Woods thought that, if she ignored the behavior, Entrikin would eventually stop. He did not behave this way with any of the male employees.

Without being invited, Entrikin also would show up unannounced at Woods' home on her day off or when she was out sick. Entrikin would stay 10 to 45 minutes, wanting to know what Woods was doing. None of the visits involved any work-related issues. Between February and June 2006, Entrikin came to Woods' home 10 to 12 times.

Entrikin's behavior created a hostile work environment for Woods. She was intimidated by Entrikin's unwanted advances, and she was afraid to tell anyone for fear that she would lose her job. There was no written or verbal policy in effect at the Joplin NAPA concerning sexual harassment. Woods did not know who was supposed to receive any complaints about sexual harassment. She was being harassed by Entrikin, her immediate supervisor. Briscoe, who was Entrikin's immediate supervisor, rarely came to Joplin NAPA. If there had been a written or verbal policy on sexual harassment, Woods would have reported the matter to Briscoe as soon as it started.

In June 2006, Woods met Leeper when they began working together on Saturday mornings at Joplin NAPA. Over a period of several weeks, the two discussed Entrikin's behavior. They learned that Entrikin was doing similar things to each of them.

*Briscoe's Investigation of the Complaints*

Jamie Kohler (Kohler) became the new store manager at Joplin NAPA in July 2006. Woods told Kohler what had been happening with Entrikin. She asked Kohler to report the matter to Briscoe. Because Kohler knew that Briscoe and Entrikin were friends, he initially refused to do anything. He was afraid he might be fired if he said anything. Thereafter, he changed his mind and reported the matter to Briscoe.

In July 2006, Ron Knapp (Knapp) was the manager of Monett NAPA. On July 19th, Leeper told Knapp that she could no longer work with Entrikin because his conduct was too much to tolerate. She explained to Knapp what Entrikin had been saying and doing to her. Knapp prepared a brief written summary for the file. He omitted some of the more egregious things that Leeper had reported about Entrikin's behavior. Knapp was afraid that, if he wrote too much, he could lose his job because Briscoe and Entrikin were as close as a father and son. Knapp had never received any training about what he was supposed to do if he received a report of sexual harassment. Even before Leeper complained about Entrikin, Knapp had seen Entrikin doing and saying things to Leeper that Knapp believed were inappropriate and offensive. Knapp had seen Entrikin: (1) reaching over Leeper's shoulder to massage the front of her chest; (2) stare at Leeper's crotch and say "I'm hungry"; (3) tell crude sexual jokes that were derogatory about women; (4) follow Leeper around the store; and (5) repeatedly ask her out to lunch. It was obvious to Knapp that Leeper was very upset and did not like what Entrikin was doing. At times, Leeper had a look of terror on her face. Even though Knapp was Leeper's manager, he did not confront Entrikin

about his inappropriate behavior. Knapp did not know what to do, and he was afraid of getting fired. There was no sexual harassment policy for him to follow as a manager.

After Leeper told Knapp that she could no longer work with Entrikin, Knapp reported the matter to Briscoe. Knapp informed Briscoe that: (1) Entrikin had been inviting Leeper to his motel room; (2) he put his hands inside her shirt and touched her breasts; (3) he put his hand down her pants; (4) he made her touch his penis with her hand; (5) he made obscene gestures to her; (6) he pretended to unzip his pants in her presence; and (7) he pulled her down onto his lap. Knapp saw Entrikin engage in inappropriate, sexual behavior toward Leeper even after Briscoe was notified.

Briscoe initially contacted an outside firm about performing a sexual harassment investigation. Because the cost was too high, he decided to investigate the matter himself. By his own admission, however, he did not have sufficient training to conduct a sexual harassment investigation.

In mid-July 2006, Briscoe came to Joplin NAPA to interview Woods. He asked no questions about what Entrikin had done. Instead, Briscoe's first question was whether Woods had done anything to invite the behavior. She was shocked by this inquiry and felt like Briscoe was on Entrikin's side. Briscoe appeared to be trying to cover up what Entrikin had done. The interview only lasted three to five minutes.

Briscoe initially contacted Leeper by telephone. The call only lasted a couple of minutes. Leeper told Briscoe that Entrikin should not continue working for NAPA. The next day, Briscoe came to Joplin NAPA and met with Leeper for about five minutes. She told Briscoe that

Entrikin had: (1) put his hand down her pants; (2) touched her breasts; (3) told her that he wanted "to fuck" her; (4) looked at her crotch and said he was hungry; (5) told her that a one-hour lunch would be enough time for some action; (6) pretended to unzip his pants when she was watching; and (7) performed gestures that simulated oral sex. After hearing that description of what Entrikin had been doing and saying, Briscoe "wanted to know what us girls had caused to bring it on." He did not seem to care about what Leeper had to say and asked no other questions of her. She believed that reporting the matter to him was a waste of time.

Thereafter, Briscoe interviewed Entrikin about Leeper's allegations. Entrikin denied that anything had happened or that he intended to harass anyone. On July 25th, Briscoe ended his investigation and concluded that the complaints by Leeper and Woods could not be substantiated. He concluded that Woods and Leeper were "touchy-feely people" who did not mind being touched and rubbed, and that they were both upset about not receiving raises.

After Woods and Leeper complained about Entrikin, Briscoe did nothing about it. There was no additional monitoring of Entrikin's activities. He continued in his position as sales manager and suffered no financial consequences as a result of the complaints made by Leeper and Woods. Entrikin later told Leeper that he thought the way he had been acting was okay. He also said the "offer," meaning the offer to have sex, "was still open." Entrikin told Woods that he had not realized his behavior was bothering her. Entrikin instructed Knapp to watch Leeper and write her up if there were any problems. Before Leeper complained about Entrikin, she was a "good employee" who had no write-ups. After her complaint, she was written

up four times in one month. Leeper's hours also were drastically cut. Leeper quit her job in October 2006 because she was not getting enough hours. After Woods complained about Entrikin's behavior, her hours also were cut to the point that she was only working eight hours per week. She quit her job in October 2007 because she needed to make more money.

As a result of the complaints made by Leeper and Woods, Briscoe implemented a written sexual harassment policy for the NAPA stores. Entrikin distributed the policy to Woods, Leeper and the store managers on August 22, 2006. All of the employees were required to read and sign their copies of the new policy. Signs were hung on the wall to inform employees of what to do if they were being sexually harassed.

■ During the trial, Briscoe filed a motion for directed verdict at the close of all of the evidence. The motion was overruled. After trial, Briscoe filed a motion for JNOV. The trial court overruled that motion as well. Briscoe argues that both rulings were in error because the MHRA does not render individual persons vicariously liable for the sexual harassment of other persons. We find no merit in this argument.

■ The MHRA prohibits an employer from discriminating against any individual because of his or her sex. In relevant part, § 213.055 states:

1. It shall be an unlawful employment practice:

(1) For an employer, because of the race, color, religion, national origin, sex, ancestry, age or disability of any individual:

(a) To fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, national origin, sex, ancestry, age or disability. . . .

§ 213.055.1(1)(a). As used in this section, the term "employer" includes "any person employing six or more persons within the state, *and any person directly acting in the interest of an employer* . . . ." § 213.010(7) (emphasis added). Plaintiffs were the direct employees of Monett NAPA and Joplin NAPA. Each company met the definition of "employer" because it employed six or more persons within the State of Missouri. In addition, Briscoe met the definition of an "employer" because he directly acted in the interest of Monett NAPA and Joplin NAPA. He was the sole managing member of each LLC and was actively involved in each store's operation. He hired Entrikin, who oversaw the operation of these stores. Briscoe also hired the manager and assistant manager of each store. In addition, Briscoe was the person who decided whether, when and how to implement a sexual harassment policy at each store. This broad statutory definition of employer plainly and unambiguously imposes individual liability in the event of discriminatory conduct. *See Hill v. Ford Motor Co.,* 277 S.W.3d 659, 669 (Mo. banc 2009); *Brady v. Curators of the University of Missouri,* 213 S.W.3d 101, 113 (Mo.App.2006); *Cooper v. Albacore Holdings, Inc.,* 204 S.W.3d 238, 243–44 (Mo.App.2006). "The statute is clear that the MHRA is intended to reach not just the corporate or public employer but any person acting directly in the interest of the employer. A supervisory employee clearly falls into that category." *Hill,* 277 S.W.3d at 669.

■ Leeper and Woods presented ample evidence for the jury to conclude that they were sexually harassed by Entrikin. He was a supervisory employee who stood

second in the chain of command below Briscoe. Both Woods and Leeper testified that they were afraid of losing their jobs if they reported that Entrikin was sexually harassing them. The Missouri Commission on Human Rights has issued legislative regulations which have the force and effect of law and are binding on courts. *See Pollock v. Wetterau Food Distribution Group,* 11 S.W.3d 754, 766–67 (Mo.App. 1999). In relevant part, these regulations state:

> An employer is subject to vicarious liability to a victimized employee with respect to sexual harassment by a supervisor with immediate (or successively higher) authority over an employee or other supervisor who the employee reasonably believes has the ability to significantly influence employment decisions affecting him or her even if the harasser is outside the employee's chain of command.

8 C.S.R. 60–3.040(17)(D).[2] Because Briscoe meets the definition of an employer as set forth in § 213.010(7), he is vicariously liable for sexual harassment committed by his supervisory employee Entrikin. *See Pollock,* 11 S.W.3d at 766–67 (holding that an employer was vicariously liable for a supervisor's sexual harassment); *Anderson v. Dillard's, Inc.,* 109 F.Supp.2d 1116, 1125 n. 5 (E.D.Mo.2000) (noting that both the MHRA and Title VII apply the same vicarious liability rule in cases involving sexual harassment by a supervisor).[3] Because Woods and Leeper were sexually harassed by a supervisor, rather than a co-worker, they were not required to prove that Briscoe knew or should have known about the harassment and failed to take prompt and effective remedial action. *See Hill,* 277 S.W.3d at 666 n. 6; *see, e.g., Barekman v. City of Republic,* 232 S.W.3d 675, 679 (Mo.App.2007).

Briscoe argues, however, that he cannot be held vicariously liable in this case because of 8 C.S.R. 60–3.010(8), which states:

> Employer. A person is an employer subject to the provisions of Chapter 213, RSMo if at the time of the alleged discrimination that person employs six (6) or more persons within the state, whether these persons are temporary, part-time or permanent employees.

*Id.* Briscoe argues that this regulation restricts the definition of employer found in § 213.010(7). We disagree. Briscoe's proposed interpretation of this regulation would cause it to be in direct conflict with the statutory definition of employer. It is well-settled that a regulation in direct conflict with a statute is invalid. *See, e.g., Hansen v. State, Dept. of Social Services, Family Support Div.,* 226 S.W.3d 137, 143–44 (Mo. banc 2007); *Levinson v. State,* 104 S.W.3d 409, 412 (Mo. banc 2003); *Gasconade County Counseling Services, Inc. v. Missouri Dept. of Health,* 314 S.W.3d 368, 377–78 (Mo.App.2010). Consequently, we decline to adopt that interpretation. Instead, we interpret this regulation to simply clarify that temporary, part-time and permanent employees must be count-

---

**2.** All references to state regulations are to the Code of State Regulations (2001).

**3.** 8 C.S.R. 60–3.040(17)(D)1 states:
When no tangible employment action is taken, an employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. The defense comprises two necessary elements: a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and b) that the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.
Briscoe chose not to assert this affirmative defense.

ed when determining whether a person meets the statutory definition of employer set forth in § 213.010(7). Point I is denied.

### Point II

Briscoe's second point challenges the verdict-directing instructions given against him. The following additional facts are relevant to this point. During the instruction conference, the trial court decided to give Instructions 7, 8, 13 and 14. Instruction 7 was Woods' verdict-directing instruction against Joplin NAPA. This instruction stated:

### INSTRUCTION NO. 7

On plaintiff Hillary Woods's sexual harassment claim against defendant [Joplin NAPA], your verdict must be for plaintiff Woods and against that defendant if:

*First,* plaintiff Woods was subjected to unwelcome sexual harassment;

*Second,* plaintiff Woods's sex was a contributing factor in the harassment;

*Third,* the harassment was sufficiently severe or pervasive enough to create an intimidating, hostile or offensive working environment; and

*Fourth,* as a direct result of such harassment, plaintiff Woods sustained damage.

Instruction 13 was Leeper's verdict-directing instruction against Monett NAPA and Joplin NAPA. Instructions 8 and 14 were Woods' and Leepers' verdict-directing instructions, respectively, against Entrikin. Aside from changes relating to the differences in party names, all three of these instructions were identical to Instruction No. 7.

Plaintiffs' counsel initially offered verdict-directing instructions against Briscoe that would have permitted the jury to find him vicariously liable for Entrikin's sexual harassment. Defense counsel objected to those instructions and persuaded the court to give different instructions that required the jury to find that "Briscoe has to do something." The trial court suggested that the instruction require the jury to find that Bricoe "failed to prevent" Plaintiffs' sexual harassment. Defense counsel and Plaintiffs' counsel agreed to make that change in the instructions. As modified at defense counsel's request, Instruction 9 stated:

### INSTRUCTION NO. 9

On plaintiff Hillary Woods's sexual harassment claim against defendant Alvin Briscoe, your verdict must be for plaintiff Woods and against that defendant if:

*First,* defendant Alvin Briscoe failed to prevent plaintiff Woods from being subjected to unwelcome sexual harassment;

*Second,* plaintiff Woods's sex was a contributing factor in the harassment;

*Third,* the harassment was sufficiently severe or pervasive enough to create an intimidating, hostile or offensive working environment; and

*Fourth,* as a direct result of such harassment, plaintiff Woods sustained damage.

Aside from the substitution of Leeper's name as plaintiff, Instruction 15 was identical to Instruction 9. Defense counsel objected to both instructions on the ground that they incorrectly imposed a legal duty upon Briscoe, in his individual capacity, to prevent sexual harassment.

In Briscoe's motion for new trial, he renewed his objection that Instructions 9 and 15 incorrectly imposed a legal duty on Briscoe to prevent sexual harassment. The motion also raised the new objections that: (1) the instructions were a "roving commission" that allowed the jury to speculate about what Briscoe could have done

to prevent Plaintiffs' sexual harassment; and (2) the instructions did not require the jury to find that Briscoe discriminated against Plaintiffs. The trial court denied the motion.

Whether the jury was properly instructed is a question of law that an appellate court reviews *de novo*. *Hayes v. Price*, 313 S.W.3d 645, 650 (Mo. banc 2010). We will not reverse a verdict for instructional error unless it materially affected the merits of the action by misdirecting, misleading or confusing the jury. *See Klotz v. St. Anthony's Medical Center*, 311 S.W.3d 752, 767 (Mo. banc 2010); *Koppe v. Campbell*, 318 S.W.3d 233, 246–47 (Mo.App.2010). Briscoe contends the trial court erred in denying his motion for new trial because Instructions 9 and 15 imposed a legal duty that does not exist under the MHRA. Briscoe argues that he had no legal duty to prevent sexual harassment by another individual. We disagree.

Whether a duty exists is purely a question of law. *Richey v. DP Properties, LP*, 252 S.W.3d 249, 251 (Mo.App.2008); *Newell Rubbermaid, Inc. v. Efficient Solutions, Inc.*, 252 S.W.3d 164, 175 (Mo.App. 2007). As we held in our discussion of Point I, Briscoe meets the definition of employer set forth in § 213.010(7) because he directly acted in the interest of Monett NAPA and Joplin NAPA. Therefore, he can be held individually liable in the event of discriminatory conduct. *See Hill*, 277 S.W.3d at 667. The MHRA does impose a duty upon an employer to prevent sexual harassment of an employee by a supervisor. The existence of such a duty arises from two sources: (1) the imposition of vicarious liability on an employer for sexual harassment committed by a supervisor; and (2) the creation of an affirmative defense relieving the employer of such vicarious liability under certain circumstances if the employer can prove, *inter alia*, that it used reasonable care to prevent any sexu-

ally harassing behavior by a supervisor. *See* 8 C.S.R. 60–3.040(17)(D) and (D)1; *Hill*, 277 S.W.3d at 667. During Briscoe's videotaped deposition, which was admitted in evidence and played for the jury, he acknowledged that he had a duty to prevent the sexual harassment of employees at his stores. Accordingly, we find no merit in Briscoe's assertion that Instructions 9 and 15 erroneously imposed a legal duty upon him that does not exist.

Briscoe also argues that: (1) Instructions 9 and 15 were a "roving commission" that allowed the jury to speculate about what Briscoe could have done to prevent Plaintiffs' sexual harassment; and (2) neither instruction required the jury to find that Briscoe committed a discriminatory employment practice. In relevant part, Rule 70.03 states that "[c]ounsel shall make specific objections to instructions considered erroneous. No party may assign as error the giving or failure to give instructions unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." *Id.* Neither of the foregoing objections was made by Briscoe before the jury retired to consider its verdict. Instead, these objections were first raised in Briscoe's motion for new trial. Because these claims of error are not preserved for appellate review, we decline to address them. *Sparkman v. Columbia Mut. Ins. Co.*, 271 S.W.3d 619, 625 (Mo.App.2008); *Hadley v. Burton*, 265 S.W.3d 361, 374 (Mo.App. 2008). In addition, it was Briscoe's objections that led the court to reject Plaintiffs' vicarious liability verdict-directing instructions and require the modification of Instructions 9 and 15. Defense counsel agreed with the language that was used in those paragraphs. To the extent there was any error in Instructions 9 and 15, it was invited by Briscoe. A party may not complain on appeal of an alleged error in which he joined, acquiesced or invited by

his conduct at trial. *Barnes v. Morris Oil Co.*, 263 S.W.3d 697, 702 (Mo.App.2008); *In re Marriage of Murphey*, 207 S.W.3d 679, 685 (Mo.App.2006). Point II is denied.

### Point III

In Briscoe's third point, he contends the trial court erred in denying his motion for directed verdict at the close of all of the evidence and his motion for JNOV on the issue of Briscoe's liability for punitive damages. Briscoe argues that Plaintiffs failed to present sufficient evidence of malice or reckless indifference on Briscoe's part to warrant the submission of that issue to the jury. We disagree.

A succinct summary of the applicable standard of review is set out in *Alhalabi v. Missouri Dept. of Natural Resources*, 300 S.W.3d 518 (Mo.App.2009):

> Section 213.111 provides that the court may award punitive damages to the plaintiff in an action filed pursuant to the MHRA. Whether there is sufficient evidence to support an award of punitive damages is a question of law. We review the evidence presented to determine whether it was sufficient, as a matter of law, to submit the claim for punitive damages. In doing so, we view the evidence and all reasonable inferences in the light most favorable to submissibility and we disregard all evidence and inferences which are adverse thereto. Only evidence that tends to support the submission should be considered. A submissible case is made if the evidence and the inferences drawn therefrom are sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity that the defendant's conduct was outrageous because of evil motive or reckless indifference.

*Id.* at 528–29 (citations omitted). Viewed most favorably to the submission, Plaintiffs presented the following evidence.

Briscoe was the sole managing member of Joplin NAPA and Monett NAPA. He was the person who decided whether, when and how to implement a sexual harassment policy for these stores. When Plaintiffs were hired, there was no policy to prevent sexual harassment in place at either store. Neither supervisors nor employees received any education or training about what type of behavior was acceptable for the workplace. Neither supervisors nor employees knew who was to receive complaints about sexually harassing behavior or how such an occurrence should be reported.

In the summer of 2005, Leeper suffered sexual harassment by her store manager, Hardwick, when he rubbed his penis against her buttocks. Leeper reported the matter to Entrikin, who was second in command below Briscoe. There were no procedures in effect requiring Briscoe to be notified of the incident. Entrikin did nothing about it. Hardwick was not disciplined, and no record of the incident was placed in his personnel file. In fact, Entrikin merely told Leeper to watch how she behaved.

After the Hardwick incident occurred, Entrikin began subjecting both Woods and Leeper to severe sexual harassment that lasted for months. Both Plaintiffs testified that they did not know who to tell about Entrikin's behavior or what procedures to follow. Because of the close relationship between Entrikin and Briscoe, both Plaintiffs were afraid they would lose their jobs if they said anything. That fear was shared by their own supervisors. When Woods finally told her store manager, Kohler, about what Entrikin had been doing, Kohler initially refused to do anything because he was afraid he would get fired. The same thing occurred when Leeper told her store manager, Knapp, what was hap-

pening. He did report the matter to Briscoe, but most of the egregious details Knapp had learned from Leeper were left out of the written summary that Knapp prepared for the file. He was afraid that, if he wrote too much, he would get fired. Knapp had observed Entrikin doing and saying inappropriate and offensive things to Leeper before she even complained about them. Because there was no sexual harassment policy for Knapp to follow, he had no idea what he was supposed to do about it. He also was afraid of getting fired because the sexual harasser was his supervisor.

In addition, Plaintiffs presented evidence that Briscoe knew he did not have sufficient training to conduct an investigation of their sexual harassment claims. He chose not to hire an outside company to perform the investigation because of cost. Briscoe performed a very cursory and biased investigation of their complaints. Briscoe's interviews with Plaintiffs were brief and one-sided. From the outset, he made statements to Plaintiffs suggesting they were at fault for what had happened. After a short investigation, Briscoe concluded that their complaints could not be substantiated, even though Knapp had seen Entrikin doing and saying sexually inappropriate things to Leeper. This evidence alone tended to prove that Briscoe acted with reckless disregard for Plaintiffs' rights. *See Alhalabi,* 300 S.W.3d at 528–29 (noting that DNR acted with reckless disregard for the plaintiff's rights when it failed to properly investigate his complaints of discrimination). Plaintiffs' complaints about Entrikin yielded no result. Nothing was done to him, and he later made statements suggesting that he saw nothing wrong with his actions.

After reviewing the record, we conclude that there was sufficient evidence from which a reasonable juror could conclude that Briscoe acted with reckless disregard for Plaintiffs' rights. *See Claus v. Intrigue Hotels, LLC,* 328 S.W.3d 777, 782–84 (Mo.App.2010) (noting that the proof supporting a plaintiff's underlying claim and an additional claim for punitive damages is not mutually exclusive, and evidence tending to support the underlying claim often permits a reasonable fact-finder to conclude that the defendant acted with an evil motive or reckless indifference). Therefore, the trial court did not err in submitting the issue of Briscoe's liability for punitive damages to the jury. Point III is denied, and the judgment of the trial court is affirmed.

BARNEY and BURRELL, JJ., concur.