

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| DELISE DIAZ, | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | **WD77861** |
| v. | ) | **(Consolidated with WD77867)** |
| | ) | |
| | ) | **OPINION FILED:** |
| AUTOZONERS, LLC, d/b/a AUTOZONE, | ) | **November 10, 2015** |
| et al., | ) | |
| | ) | |
| Respondents-Appellants. | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable James F. Kanatzar, Judge**

**Before Division Three:** Karen King Mitchell, Presiding Judge, and
Lisa White Hardwick and Anthony Rex Gabbert, Judges

Delise Diaz filed suit under the Missouri Human Rights Act (MHRA) against AutoZoners, LLC, and AutoZone, Inc. (collectively "Defendants"),[1] alleging that sexual harassment engaged in by two customers of the AutoZone store where Diaz worked created a hostile work environment and that Defendants retaliated against Diaz when she complained of the harassing conduct. A jury found in favor of Diaz and against both Defendants on her hostile

---

[1] Brent George (the manager of the store where Diaz worked), Charles "Chuck" Smith (the district manager), and Shane Williams (the commercial sales manager of the store where Diaz worked) were also named defendants in the suit, but none are parties on appeal. Diaz voluntarily dismissed her claims against George, Smith, and Williams before trial.

work environment claim, but it found in favor of both Defendants on Diaz's retaliation claim. The jury awarded Diaz $75,000 in compensatory damages, $1,000,000 in punitive damages against AutoZoners, LLC, and $1,500,000 in punitive damages against AutoZone, Inc. The trial court awarded Diaz $243,826.25 in attorneys' fees and assessed costs against Defendants in the amount of $10,075.05. Defendants appeal the denial of their motion for judgment notwithstanding the verdict, or alternatively, their motions for new trial and remittitur. Diaz cross-appeals the trial court's denial of her post-trial request to amend the judgment for additional attorneys' fees and costs incurred in responding to Defendants' post-trial motions.

## Background[2]

"AutoZone" is an auto parts retailer, and its corporate structure is as follows.[3] AutoZoners, LLC, is a limited liability company licensed to do business in Missouri. It is wholly owned by AutoZone Stores, Inc. ("Stores"), and is responsible for leasing employees to Stores. Stores is a corporation, also licensed to do business in Missouri, and it is the sales agent to the general public. Stores is wholly owned by AutoZone Parts, Inc. ("Parts"). Parts is also a corporation, but it is *not* licensed to do business in Missouri. Parts is a wholesaler that provides inventory to Stores. Parts is wholly owned by AutoZone, Inc. AutoZone, Inc., is a publicly traded corporation, directly owned by shareholders and run by a board of directors. AutoZone, Inc., is a holding company, holding the stock of its domestic and foreign subsidiaries. "AutoZone, Inc." is a copyrighted name, owned by Parts. All four entities are organized under the laws of Nevada and share corporate headquarters in Memphis, Tennessee. In Missouri, all

---

[2] The facts are viewed in the light most favorable to the verdicts. *Host v. BNSF Ry. Co.*, 460 S.W.3d 87, 94 n.2 (Mo. App. W.D. 2015).

[3] Because these three entities come together to perform various functions of the enterprise under the name "AutoZone," we will refer to the three entities collectively as "AutoZone." When discussing particular entities, we refer to them by their individual names (i.e., AutoZoners, LLC, Stores, or Parts).

employees of "AutoZone" are employed solely by AutoZoners, LLC.[4] Day-to-day operations of AutoZone establishments are handled by the management team of AutoZoners, LLC; AutoZone, Inc., has no control over AutoZoners, LLC.

In a typical AutoZone establishment, the store is divided into two sections: the DIY (do-it-yourself) section and the commercial sales section. Each store has a store manager, who oversees the entire store; followed by Parts Sales Managers (PSM), who are responsible for the DIY section of the store, and Commercial Sales Managers (CSM), who are responsible for the commercial sales section of the store;[5] and then there are the basic sales personnel—drivers, customer service associates, and commercial specialists, who are the lowest level employees in the store.

AutoZone had a harassment and retaliation policy, which was described as a "zero tolerance" policy. The policy was outlined in a store handbook and code of conduct, which contains the mark, "copyright 2004-2011, AutoZone, Inc." at the bottom, and which was provided to every employee during orientation. The policy applied to employees, vendors, customers, and anyone else within the work environment. Under the policy, if an employee suffered harassment, he or she had the duty to timely report the harassment to the employee's immediate manager or supervisor, though there was some evidence that reporting to any member of management would be sufficient. The policy directed:

> If you do not feel comfortable [reporting harassment to your supervisor], or feel your manager/supervisor is not handling the problem appropriately, go to higher levels of management and/or to the AutoZoner Relations department at the SSC.[6]

---

[4] Diaz testified that her paycheck was issued by AutoZoners, LLC.

[5] Some larger stores also have an assistant manager, who would be below the store manager but above both the Parts Sales Managers and Commercial Sales Managers. The Truman Road store, where Diaz was employed during the relevant time, did not have an assistant manager.

[6] SSC stood for "Store Support Center."

The policy also provided a 1-800 number to contact if the employee felt that management failed to timely rectify the problem.

Diaz, who was an employee of AutoZoners, LLC, began working at the Excelsior Springs AutoZone store on May 12, 2008, as a commercial driver. The district manager at the time was Chuck Smith. After about six months, Diaz was promoted to PSM with Smith's approval. In July of 2009, Diaz moved to the Noland Road AutoZone store, pursuant to her request for a transfer. While working at the Noland Road location, Diaz was placed in the management-in-training program, which was an internal succession program that essentially trained current employees to become managers. In January of 2010, Diaz was moved to the Truman Road AutoZone store because of the need for a Truman Road PSM to change locations. At the Truman Road store, Brent George was the store manager, and Shane Williams was a CSM.

Around March or April of 2010, after Diaz began working at the Truman Road store, she began having problems with a commercial sales customer named Mark. Mark would tell Diaz that she was pretty, and he would comment on the size of her breasts and rear end. Diaz advised Mark that his comments were inappropriate and unwelcome. Sometime in April, Mark began to get "touchy-feely" with Diaz, patting her on the back or touching her lower back. In late April or early May of 2010, Diaz complained of Mark's behavior and comments to Williams, the store's CSM. Williams laughed it off and told Diaz to "suck it up" and "do [her] job." Mark's conduct continued.

In November of 2010, Mark offered to sell Diaz some lingerie and asked her what size undergarments she wore; when she advised him that it was none of his business, Mark began guessing. Diaz reported the conduct to Williams again. Williams again responded by laughing

4

and said "Oh, he's just a pervert. And so am I." Williams advised Diaz to "[g]o back, and do [her] job."

On another occasion in either November or December of 2010, Diaz was bent over the counter placing price tags on merchandise when Mark came up behind her, grabbed her rear end, and said, "Give me some of that juicy fruit." Diaz told Mark to keep his hands off of her, and she reported the incident to both Williams and George (the store manager). Williams told Diaz to go back to work and explained that Mark spends money in the store and Williams did not want to lose a commercial account. George responded by saying that he would speak with Williams about the incident and have Williams take care of it.[7] Mark's conduct continued.

In January of 2011, Mark again grabbed Diaz from behind and remarked, "Oh, seems like your butt is getting bigger"; he also asked to see her breasts. Diaz advised Mark to keep his hands off of her and emphatically denied his request, noting that his conduct and remarks were inappropriate. Diaz again complained to Williams, who told her to go back to work, but indicated that he would discuss it with George.

On another occasion, Mark entered the store while Diaz had her back turned and was bent over the store's safe. Mark grabbed Diaz's crotch and rear end, remarking, "that's a wet one." Diaz again reported Mark's behavior to George and Williams, who again told Diaz they would take care of it. But Mark's conduct continued.

In February of 2011, Mark approached Diaz while she was assisting other customers, rubbed his arm against her breast, and said, "Hook me up, huera."[8] Mark also told her, in Spanish, that she was pretty. Diaz reported this incident to Williams, who told her to "suck it

---

[7] According to George and Karen Brown, the regional human resources manager, George immediately reported this incident to Brown, and Brown advised George to go to Williams and have a talk with the commercial accounts and put a stop to the harassment. Both George and Brown, however, claimed that they were unaware at that time of the physical contact, and believed that Mark was simply being "rude" to Diaz.

[8] Diaz testified that she understood "huera" to be Spanish for "white girl."

up" and do her job; he was not going to lose a commercial account over her crying. She also reported this incident to George, who told her he would talk to Williams about it. On another occasion in February of 2011, Mark again rubbed against Diaz while she was helping other customers, and Diaz told him that he was invading her space. When Mark tried to touch her breasts, Diaz warned him, "If you touch me, I will call the police this time. I'm not going to allow you to keep touching me." Mark became angry and told Diaz that he had a commercial account, and that nobody was going to do anything to him. Mark threatened to have Diaz fired. He then called Williams and told Williams that Diaz was refusing him service. Williams then called Diaz and told her to make Mark a priority.

After this incident, Diaz again complained to George and Williams, but this time, they indicated they would "have a talk" with the individuals. Though Diaz did not know if George and Williams followed through, she assumed they did because Mark's demeanor became more aggressive towards her. Thereafter, he would blow her kisses, and on one occasion, he stood outside the window and pointed his finger at her, imitating firing a gun. At some point during this time, Diaz had requested a transfer to a different store to get away from Mark, but George refused, telling her that they would not transfer her because she was a "problem child." According to Diaz, both George and Williams called her a "crybaby" for making the complaints. Karen Brown, the regional human resources manager, testified that George would frequently complain to her that Diaz was a "problem child" and that she created a lot of drama in his store.

Sometime after the February incident with Mark, Diaz had a problem with "Jimmy," another commercial sales customer. Jimmy commented on the size of her breasts and rear end, and on one occasion, he grabbed her rear end while she was speaking with Williams. When Diaz alerted Williams, Jimmy laughed and said to Williams, "Yeah, I just got a whole handful of her butt." Williams laughed and said, "Dang, dude. You got to grab her butt before I did." Diaz

6

also told George about this incident, and George spoke with Jimmy.[9] Shortly after that, Jimmy apologized to Diaz, and she had no further problems with him. Nevertheless, Mark continued to bother her until she transferred to a different location in late April 2011.

Diaz, frustrated with the lack of response from either Williams or George, contacted Karen Brown in February of 2011. The first time Diaz called, she was sent to voicemail, so she left a message for Brown, advising her that two commercial customers had been grabbing her and speaking sexually to her. But Brown did not call Diaz back.[10] Diaz waited a couple of weeks before calling Brown again. This time she spoke with Brown and advised Brown of the harassment, but Brown cut the conversation short because she had a meeting; she told Diaz she would either call back or "pop in the store" soon to see her. Diaz did not hear from Brown again until late April 2011. At that time, Brown opened an investigation after Diaz, in a third phone call to Brown, reported that the harassment had been continuing.[11] Brown was also interested in investigating Williams for failing to report the harassment after Diaz had lodged repeated complaints.

During the investigation, Brown interviewed Diaz, Williams, George, and Virginia Nunez (another store employee who had also been experiencing harassment from Mark and Jimmy). Brown did not speak with either Mark or Jimmy because it "was not a practice of AutoZone, for an HR manager to go and talk to customers." Brown had been specifically instructed by managing attorneys at AutoZone not to speak to customers; she was told "we don't interview customers."

---

[9] George testified that he spoke with both Mark and Jimmy and advised both men that their behavior had to stop or they would not be allowed to return to the store.

[10] Brown testified that she never received a message from Diaz.

[11] Brown testified that per her earlier conversations with George, she believed that the harassment had stopped in early 2011.

As a result of the harassment, Diaz cried frequently, suffered very bad headaches, was frequently sick, experienced a great deal of stress and anxiety, lost patches of hair, experienced difficulty sleeping and eating, attempted to cut herself, and became very angry. Diaz visited a doctor, who put her on a depression medication. She also became very timid around male customers.

Diaz was transferred out of the Truman Road store in late April 2011, but she continued to work at different AutoZone locations throughout the time of trial, and she was very happy with her job. Williams was terminated in August of 2011 for "failure to report a policy violation to upper management," regarding Diaz's complaints. Brown was terminated in April of 2013 for failing to investigate a complaint unrelated to Diaz.

As a result of the harassment at the Truman Road store, Diaz filed a two-count petition against AutoZoners, LLC, and AutoZone, Inc., alleging in Count I that, because of Mark and Jimmy's conduct and Defendants' inadequate response, she was subjected to a hostile work environment; in Count II, she alleged that Defendants retaliated against her when she complained about Mark and Jimmy. Diaz sought both compensatory and punitive damages. AutoZone, Inc., argued that it was not a proper defendant in the action because it was not Diaz's employer under the MHRA. The trial court denied AutoZone, Inc.'s motion for directed verdict, and the jury returned a verdict in favor of Diaz, against both Defendants, on her hostile work environment claim, but it found in favor of both Defendants on Diaz's retaliation claim. The jury awarded Diaz $75,000 in compensatory damages, and it awarded $1,000,000 in punitive damages against AutoZoners, LLC, and $1,500,000 in punitive damages against AutoZone, Inc.

After trial, Diaz sought to amend the judgment to include both attorneys' fees and costs. The trial court granted the motion and awarded Diaz $243,826.25 in attorneys' fees and assessed costs against Defendants in the amount of $10,075.05. Defendants filed motions for judgment

8

notwithstanding the verdict, or alternatively for a new trial and remittitur. After the trial court denied all of Defendants' post-trial motions, Diaz filed a motion for a second amended judgment, seeking an additional $32,097.50 in attorneys' fees and $703.98 in costs associated with responding to Defendants' post-trial motions. The trial court denied the motion for a second amended judgment, noting that the original award of attorneys' fees and costs "took into account and included anticipated fees and costs related to post[-]judgment pleadings." Defendants appeal the denial of their post-trial motions, and Diaz cross-appeals the denial of her motion for a second amended judgment.

## Analysis

Defendants raise eleven points on appeal; Diaz raises one. For ease of analysis, we will address the points out of order. The arguments made to this Court evidence some confusion about the application of the law in third-party harassment claims. Accordingly, we begin with a discussion of how third-party harassment claims are to be analyzed.

### A. Third-Party Harassment Claims

Under the MHRA, "[i]t shall be an unlawful employment practice . . . [f]or an employer, because of the . . . sex . . . of any individual . . . to discriminate against any individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." § 213.055.1(1)(a).[12] An "employer" is defined as "any person employing six or more persons within the state, and any person directly acting in the interest of an employer." § 213.010(7). "When reviewing cases under the MHRA, we are guided by both Missouri law and any federal employment discrimination (i.e., Title VII) case law that is consistent with Missouri law." *Tisch v. DST Sys., Inc.*, 368 S.W.3d 245, 252 n.4 (Mo. App. W.D. 2012).

---

[12] All statutory references are to the Revised Statutes of Missouri 2000, unless otherwise noted.

There are two different legal theories under which an employer may be held liable when an employee is subjected to sexual harassment in the workplace. When the harasser is a supervisor of the harassed employee, agency principles apply, and the employer is held vicariously liable for the acts of the supervisor. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 758 (1998). If the harassed employee suffers a tangible employment action resulting from supervisory harassment, the "tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer," and the employer is liable for the discriminatory conduct. *Id*. at 762. If, on the other hand, no tangible employment action occurs (for example, when an employee is subjected to a hostile work environment), the employer is entitled to an affirmative defense to liability. *Id*. at 765. "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm otherwise." *Id*.; *see also* 8 C.S.R. § 60-3.040(17)(D)1. This defense is not available, however, "when the supervisor's harassment culminates in a tangible employment action." *Burlington*, 524 U.S. at 765; 8 C.S.R. § 60-3.040(17)(D)2.

The second theory of employer liability is negligence in allowing a hostile work environment (created by a non-supervisory employee or other third party) to exist and failing to remedy it. "An employer in this kind of case may be liable at most for its *own* negligence in allowing the conduct of its customers to turn its workplace into a hostile work environment . . . ." *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 426 (4th Cir. 2014) (Niemeyer, J., concurring in part and dissenting in part). "[T]he analysis must focus on identifying when the employer knew or should have known that its employee was being subjected to harassment based on the employee's 'race, color, religion, sex, or national origin.'" *Id*. (quoting 42 U.S.C.

10

§ 2000e-2(a)(1)).   The analysis then turns to "evaluating the adequacy of the employer's response at that point."  *Id*.   Indeed, the majority of federal circuits hold that "employers may be liable for failing to remedy the harassment of employees by third parties who create a hostile work environment."  *Beckford v. Dep't of Corr.*, 605 F.3d 951, 957, 958 (11th Cir. 2010) (collecting cases from the 1st, 6th, 7th, 8th, 9th, and 10th Circuits); *see also Freeman*, 750 F.3d at 423 ("[A]n employer is liable under Title VII for third parties creating a hostile work environment if the employer knew or should have known of the harassment and failed 'to take prompt remedial action reasonably calculated to end the harassment.'" (quoting *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1131 (4th Cir. 1995))).   And "[b]ecause liability is direct rather than derivative, it makes no difference whether the person whose acts are complained of is an employee, an independent contractor, or for that matter a customer.  Ability to 'control' the actor plays no role."  *Dunn v. Wash. Cty. Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005).

The *Burlington* affirmative defense available in vicarious liability cases is inapplicable in the negligence context because the defense is already subsumed in the elements of the negligence cause of action.  An employer has a duty under both Title VII and the MHRA to maintain a work environment free from discrimination based upon any of its employees' protected classifications.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66-67 (1986); *Mason v. Wal-Mart Stores, Inc.*, 91 S.W.3d 738, 742 (Mo. App. W.D. 2002).  When an employee suffers discrimination by a third party who the employee comes into contact with because of the employment relationship, and the harassment is sufficiently severe and pervasive to create a hostile work environment, the employer breaches its duty if it knows or should have known of the discrimination and fails to take prompt and effective remedial action.  *Mason*, 91 S.W.3d at 742.

11

There is also a distinction in liability for punitive damages. Both Title VII and the MHRA authorize punitive damage awards. 42 U.S.C. § 1981a(a)(1); § 213.111.2. Under the MHRA, "to recover punitive damages, plaintiffs [must] adduce 'clear and convincing proof of a culpable mental state, either from a wanton, willful, or outrageous act, or from reckless disregard for an act's consequences such that an evil motive may be inferred.'" *Hill v. City of St. Louis*, 371 S.W.3d 66, 71 (Mo. App. E.D. 2012) (quoting *Alhalabi v. Mo. Dep't of Nat. Res.*, 300 S.W.3d 518, 529 (Mo. App. E.D. 2009)). When an employer's liability is vicarious, the employer may raise a "good faith" defense to punitive damages by proving that "the discriminatory employment decisions of managerial agents . . . are contrary to the employer's 'good-faith efforts to comply with Title VII.'" *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 545 (1999) (quoting *Kolstad v. Am. Dental Ass'n*, 139 F.3d 958, 974 (D.C. Cir. 1998) (Tatel, J., dissenting)). But, because "reasonableness rather than good faith is the standard by which negligence is to be determined," *Hiett v. Dir. of Revenue*, 899 S.W.2d 870, 873 (Mo. banc 1995), the "good faith" defense to punitive damages is unavailable in third-party harassment actions premised on negligence.

In this case, Diaz has sued Defendants under a negligence theory, arguing that the harassment by Mark and Jimmy created a hostile work environment, that Defendants knew or should have known of the harassment, and that they failed to take prompt and effective remedial action. Diaz further argued that she was entitled to punitive damages because the Defendants acted with evil motive or in reckless disregard of Diaz's rights. Because her action is based in negligence, neither the *Burlington* affirmative defense nor the *Kolstad* "good faith" defense is applicable. The sole questions pertaining to liability are whether the Defendants knew of the harassment and, if so, whether they responded promptly and effectively; and if there is liability

for compensatory damages, whether the heightened mental state is present to support an award of punitive damages.

**B. AutoZone, Inc., was not Diaz's employer (Defendants' Points I, V, and VII).**

In their first point on appeal, Defendants argue that AutoZone, Inc., had no liability whatsoever because it was not Diaz's employer for purposes of the MHRA.[13] We agree.

The MHRA defines "employer" as "any person[14] employing six or more persons within the state, and any person directly acting in the interest of an employer." § 213.010(7). Though we are guided by federal Title VII cases, we also recognize that "[t]he Missouri legislature chose to employ language within the MHRA definition of 'employer' that is broader in scope than that found in Title VII." *Cooper v. Albacore Holdings, Inc.*, 204 S.W.3d 238, 244 (Mo. App. E.D. 2006).

Defendants argue that AutoZone, Inc., did not meet the definition of employer because it has no employees, is not licensed to do business in Missouri, and does not directly act in the interest of AutoZoners, LLC. Diaz counters that AutoZone, Inc., *did* directly act in the interest of AutoZoners, LLC, and therefore was an employer under the MHRA. In support of her argument, Diaz claims that AutoZone, Inc., engaged in certain acts that benefitted AutoZoners, LLC, and she claims that AutoZone, Inc., and AutoZoners, LLC, were "joint employers," such that both are liable.

To begin, the parties agree that AutoZoners, LLC, is an employer under the MHRA. They also agree that AutoZone, Inc., does not meet the definition of "employer" insofar as it does not employ six or more persons within the state. They disagree, however, as to whether

---

[13] Because Defendants raise this point as a challenge to the sufficiency of the evidence, we review the claim de novo, accepting all facts and reasonable inferences in the light most favorable to the verdicts. *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 364-65 (Mo. App. E.D. 2014).

[14] "Person" is defined as "one or more individuals, corporations, partnerships, associations, organizations, labor organizations, legal representatives, mutual companies, joint stock companies, trusts, trustees, trustees in bankruptcy, receivers, fiduciaries, or other organized groups of persons." § 213.010(14).

AutoZone, Inc., can be considered a "person directly acting in the interest of an employer," with that employer being AutoZoners, LLC.

"Person" for purposes of the "directly acting in the interest of an employer" provision of the MHRA, is defined to include both individuals and corporations. § 213.010(14). Courts have held that "the plain and unambiguous language under this definition of employer imposes individual liability in the event of discriminatory conduct," *Reed v. McDonald's Corp.*, 363 S.W.3d 134, 139 (Mo. App. E.D. 2012), but only "when the individuals directly oversaw or were actively involved in the discriminatory conduct." *Id.* We have found no Missouri cases applying the "directly acting in the interest of" definition outside the context of a supervisory employee. *See, e.g., Hill v. Ford Motor Co.*, 277 S.W.3d 659, 669 (Mo. banc 2009); *Reed*, 363 S.W.3d at 139; *Leeper v. Scorpio Supply IV, LLC*, 351 S.W.3d 784, 792 (Mo. App. S.D. 2011). Here, Diaz seeks to apply the definition to the parent corporation of her employer.[15] In doing so, Diaz argues that—contrary to our prior cases involving individuals—she need not prove that AutoZone, Inc., directly oversaw or was actively involved in the discriminatory conduct. Instead, she argues that a corporation can be deemed an employer for purposes of the MHRA if it "act[ed] on behalf" of the employer-in-fact corporation in any way. We disagree.

In her brief, Diaz presents what she deems alternative theories to support her argument that AutoZone, Inc., directly acted in the interests of AutoZoners, LLC. She first argues that AutoZone, Inc., took direct actions benefitting AutoZoners, LLC, and thereby became a statutory employer. She then argues that, under federal employment law cases, AutoZone, Inc., could be deemed to be acting in the interests of AutoZoners, LLC, because they were "joint employers."[16]

---

[15] "[A] parent corporation is normally not liable for the acts of its subsidiary corporations." *Blanks*, 450 S.W.3d at 375. "The mere existence of a parent-subsidiary relationship, without more, does not subject a parent corporation to liability for the acts of the subsidiary." *Id.*

[16] The verdict-director provided to the jury regarding AutoZone, Inc.'s liability required the jury to find that "AutoZone, Inc. was an employer of plaintiff in the actions alleged in paragraphs second through fifth." It also

14

Though she presents these as alternative arguments, they are really one in the same because Missouri uses only one multi-factor test when determining whether a particular work relationship constitutes an employment one. And that test requires more than simply acting on behalf of the employer-in-fact.[17]

"In cases involving multiple alleged employers, Missouri courts have utilized several factors to ascertain whether a particular work relationship qualifies as an employer-employee relationship . . . ." *Tolentino v. Starwood Hotels & Resorts Worldwide, Inc.*, 437 S.W.3d 754, 758 (Mo. banc 2014) (analyzing whether the defendant constituted the plaintiff's employer for purposes of the Missouri Minimum Wage Law (MMWL)).[18] This test is generally known as the "economic realities" test. Much like the definition in the MHRA, under the MMWL, "[a]n 'employer' is 'any person acting directly or indirectly in the interest of an employer in relation to an employee.'"[19] *Id*. at 757 (quoting § 290.500(4)). There are five factors courts generally look to in the economic realities test:

> (1) who has the power to hire and fire the worker; (2) who supervises and controls the worker's work schedule and conditions of work; (3) who determines the rate and method of payment of the worker; (4) who maintains work records; and (5) whether the alleged employers' premises and equipment were used for the plaintiff's work.

indicated that "[t]he phrase, 'employer' as used in this Instruction includes a corporation who directly acts in the interest of an employer." Neither the term, "joint employer," nor any of the factors associated with the doctrine are identified anywhere within the instructions.

Under federal law, the joint employer doctrine is a means by which "an entity other than an employee's formal employer can be held liable . . . because the two entities 'handle certain aspects of their employer-employee relationship jointly.'" *Shiflett v. Scores Holding Co., Inc*., 601 Fed. Appx. 28, 30 (2d Cir. 2015) (quoting *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005)). Under this doctrine, "a court may conclude that 'the employee is . . . constructively employed by' the defendant." *Id.* (quoting *Arculeo*, 425 F.3d at 198).

[17] The MHRA does not use the language, acting "on behalf" of; the language used is "directly acting in the interests of." § 213.010(7). To the extent Diaz is attempting to articulate a less stringent standard, that argument is rejected.

[18] In *Tolentino*, the Missouri Supreme Court was asked to apply the "joint employer" doctrine to the MMWL claim. *Tolentino v. Starwood Hotels & Resorts Worldwide, Inc.*, 437 S.W.3d 754, 757 (Mo. banc 2014). Though Diaz argues that the Supreme Court adopted the "joint employer" doctrine, the Court did not actually address it other than to note that "[t]he MMWL does not use or define the term 'joint employer.'" *Id.*

[19] Arguably, the MMWL is broader, given that it also covers those acting *in*directly in the interest of an employer, while the MHRA covers only individuals acting *directly* in the interests of the employer. But this is a question we need not answer.

*Id*. at 758.

Though these factors are highly relevant to MMWL claims, they are less relevant to MHRA claims, and they fail to account for the requirement that one "directly acting in the interests of an employer" must either directly oversee or be actively involved in the discriminatory conduct. *See Hill*, 277 S.W.3d at 669; *Reed*, 363 S.W.3d at 139; *Leeper*, 351 S.W.3d at 792-93. Accordingly, when applying the economic realities test in the context of the MHRA, it must be modified to account for the statutory requirement that an entity that is not the employer-in-fact "directly act[s] in the interest of" the employer-in-fact. § 213.010(7). Under the modified version, the court should consider the following factors: (1) who was responsible for establishing policies and training employees concerning harassment; (2) who was responsible for receiving, investigating, and responding to harassment complaints; and (3) who had the power to discipline employees who may have failed to comply with anti-harassment policies. These factors are relevant to determining whether an entity may be properly considered an "employer" for purposes of the MHRA, because it is only when these factors are present that an entity can be deemed to be "directly acting in the interest of an employer," as that phrase has been interpreted in prior cases.

To support her claim that AutoZone, Inc., was directly acting in the interest of AutoZoners, LLC, Diaz asserts that there was sufficient evidence from which the jury could have concluded that: (1) AutoZone, Inc., was the public face of the enterprise as a whole; (2) AutoZone, Inc., provided AutoZoners, LLC, with the Store Handbook and Code of Conduct, which was provided to every employee during orientation; (3) AutoZone, Inc., provided the documents used for human resource and loss prevention investigations; (4) AutoZone, Inc., responded to Diaz's charge of discrimination; and (5) AutoZone, Inc., was responsible for an

unwritten rule of nonenforcement of the anti-harassment policy when the alleged harassers were customers of the business. None of these allegations demonstrate that AutoZone, Inc., was Diaz's employer.

First, simply being the public face of the enterprise, as a whole, does not demonstrate that AutoZone, Inc., either directly oversaw or was actively involved in the discrimination insofar as it does not show that AutoZone, Inc.: (1) was responsible for establishing policies or training employees; (2) was responsible for the receipt, investigation, and response to harassment claims; or (3) had the power to discipline noncompliant employees. Thus, the simple fact that AutoZone, Inc., was the public face of the enterprise does not support Diaz's argument that AutoZone, Inc., was her employer.

Likewise, the provision of either the Store Handbook and Code of Conduct, or the various human resources and loss prevention documents, in and of itself, does not make AutoZone, Inc., Diaz's employer because—again—it does not establish that AutoZone, Inc., either directly oversaw or was actively involved in the discrimination. Though it may support a determination that AutoZone, Inc., was responsible for establishing policies, it does not demonstrate that AutoZone, Inc., was responsible for training employees; receiving, investigating, and responding to complaints; or disciplining noncompliant employees. And the simple provision of training manuals has been held insufficient to establish employer status. *See, e.g., Conrad v. Waffle House, Inc.*, 351 S.W.3d 813 (Mo. App. S.D. 2011) (rejecting, as "misguided," the argument that the provision of a training manual by a franchisor to a franchisee rendered the franchisor an employer for purposes of the MMWL);[20] *In re Enterprise Rent-A-Car*

---

[20] In *Conrad v. Waffle House, Inc.*, 351 S.W.3d 813 (Mo. App. S.D. 2011), the Southern District, explained its rationale, noting that:

> A franchisor does have a legitimate interest in retaining some degree of control in order to protect the integrity of its marks; however, the existence of those requirements does not necessarily mean

17

*Wage & Hour Employment Practices Litigation*, 683 F.3d 462, 466, 471 (3d Cir. 2012) (rejecting claim that corporate holding company was the plaintiff's employer under the Fair Labor Standards Act, 29 U.S.C. § 207, merely because it provided guidelines and manuals to its subsidiaries); *Schlotzsky's, Inc. v. Hyde*, 538 S.E.2d 561, 562 (Ga. App. 2000) (rejecting argument that the provision of an operations manual rendered franchisor liable for acts of franchisee).

Furthermore, the fact that AutoZone, Inc., responded to Diaz's charge of discrimination—after the harassment occurred and had been remedied—does not establish that AutoZone, Inc., was Diaz's employer at the time of the harassment or that it directly oversaw or was actively involved in the discrimination, as outlined in the modified economic realities test laid out above. *See Eckert v. Schroeder, Joseph & Assoc.*, 364 F. Supp. 2d 326, 327-28 (W.D. N.Y. 2005) (rejecting claim that attorneys retained to represent employer in litigation brought by former employee under FMLA were "person[s] who act[], directly or indirectly, in the interest of an employer"); *Conrad*, 351 S.W.3d at 821 (rejecting the argument that franchisor became the plaintiff's employer under the MMWL once it took over the franchisee's operation a year and a half *after* the plaintiff resigned because the ability to terminate a franchise agreement was in no way related to whether the franchisor maintained control over the plaintiff's schedule or conditions of employment).

---

a franchisor has a role in supervising and controlling an employee's work schedule or conditions of employment to qualify the franchisor as a statutory employer. In fact, various courts considering the economic real[i]ties test have found that when a franchisor retains certain rights—such as the right to enforce standards, the right to terminate the agreement for failure to meet standards, the right to inspect the premises, the right to require that franchisees undergo certain training, or the mere making of suggestions and recommendations—along with actions taken to enforce those rights, did not amount to sufficient control to subject the franchisor to liability for franchisee's actions.

*Id*. at 821-22. Here, though AutoZone is not a franchise establishment, the same rationale applies. AutoZone, Inc., is a copyrighted name that represents the public face of AutoZone establishments. Thus, it has an interest in protecting the integrity of the AutoZone name and associated standards, as well as maintaining a consistency across its various subsidiaries.

18

Only one of Diaz's assertions regarding the conduct of AutoZone, Inc., could be characterized as having anything to do with oversight or involvement in the discrimination, and that is the allegation that AutoZone, Inc., was responsible for an unwritten rule of nonenforcement of the anti-harassment policy when the alleged harassers were customers of the business. Though this allegation suggests that AutoZone, Inc., was responsible for policies and training, as well as receipt, investigation, and responding to complaints, this assertion was not supported by the evidence presented at trial. To the extent the evidence may have supported the existence of an unwritten policy, there was no evidence presented connecting AutoZone, Inc., to such a policy.

Rather than attempt to apply the relevant factors identified above, Diaz identifies different factors, which she claims are relevant for determining whether two separate entities may be considered "joint employers." She argues that the following four factors are relevant to the determination: "(1) the degree of interrelation between the operations of the entities in question; (2) the degree to which those entities share common management; (3) the degree of centralized control of labor relations as between those entities; and (4) the degree of common ownership or financial control of the entities."

The factors Diaz cites, however, are not relevant to the "joint employer" test. Rather, they are factors used for the "single employer" test, where "'superficially distinct entities may be exposed to liability upon a finding they represent a single, integrated enterprise: a single employer.'" *Schweitzer v. Advanced Telemarketing Corp.*, 104 F.3d 761, 763 (5th Cir. 1997) (quoting *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir. 1983)). We have found no Missouri case recognizing or applying the "single employer" doctrine. In fact, it appears that Missouri recognizes only "two doctrines by which to hold a parent corporation liable for the acts of a subsidiary: piercing the corporate veil and agency." *Blanks v. Fluor Corp.*, 450 S.W.3d

19

308, 374 (Mo. App. E.D. 2014). And neither doctrine can properly be characterized as the "joint employer" test Diaz suggests we apply.[21]

In Missouri, "two separate corporations are regarded as wholly distinct legal entities, even if one partly or wholly owns the other." *Id*. at 375. "[T]he parent-subsidiary separation should be 'ignored with caution and only when the circumstances clearly justify it.'" *Id*. at 376 (quoting *Doe 1631 v. Quest Diagnostics, Inc.*, 395 S.W.3d 8, 18 (Mo. banc 2013)).[22] Here, Diaz has failed not only to apply the factors relevant to the employer analysis but also to cite any factors relevant to either of the recognized Missouri doctrines used to hold a parent corporation liable for the acts of its subsidiary. Thus, she has wholly failed to meet her burden of proving that AutoZone, Inc., was an employer for purposes of the MHRA.

---

[21] Furthermore, there was no instruction given to the jury laying out the factors Diaz now relies upon for AutoZone, Inc.'s liability.

[22] Numerous federal cases have refused to find mere holding companies, like AutoZone, Inc., liable as employers under various federal employment laws. *See, e.g., Sobelman v. Commerce Bancshares, Inc.*, 444 F. Supp. 84, 85 (E.D. Mo. 1977) (ADEA; finding no significance to the fact that the plaintiff was covered in a benefit plan in the name of the holding company); *Williams v. Asbury Auto. Grp., Inc.*, 998 F. Supp. 2d 769, 783 (E.D. Ark. 2014) (ADEA); *Dollman v. Mast Indus., Inc.*, 731 F. Supp. 2d 328, 341 (S.D. N.Y. 2010) (dismissed holding company from Title VII and Pregnancy Discrimination Act case); *Heinrich v. Serv. Corp. Int'l*, 2009 WL 2177229, *3-5 (W.D. Pa. July 22, 2009) (finding no personal jurisdiction over holding company in FMLA action; rejecting arguments based upon use of a common trademark/logo, common employee handbook, and common human resources management); *Cooper v. Southern Co.*, 260 F. Supp. 2d 1258, 1262 n.1 (N.D. Ga. 2003) (finding existence of company-wide human resources department "irrelevant" in Title VII and § 1981 case); *Bass v. Lifecare Holdings, Inc.*, 2000 WL 377815, *3-5 (E.D. La. April 12, 2000) (Title VII and Louisiana anti-discrimination law; "Common management and ownership between a corporation and its subsidiaries 'are ordinary aspects of a parent-subsidiary relationship' and are insufficient by themselves to establish single employer status." (quoting *Lusk v. FoxMeyer Health Corp.*, 129 F.3d 773, 778 (5th Cir. 1997))); *Mitchell v. Abercrombie & Fitch, Co.*, 428 F. Supp. 2d 725, 744-45 (S.D. Ohio 2006) (Fair Labor Standards Act); *Rudy v. Walter Coke, Inc.*, 21 F. Supp. 3d 1228, 1235-36 (N.D. Ala. 2014) (finding holding company not to be employer under either FMLA or ERISA); *In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litigation*, 683 F.3d 462, 466, 471 (3d Cir. 2012) (rejecting claim that corporate holding company was the plaintiff's employer for purposes of FLSA merely because it provided guidelines and manuals to its subsidiaries); *but see Jones v. FMSC Leasehold, LLC*, 2009 WL 1663967, *2-3 (W.D. Tenn. June 12, 2009) (finding holding company liable under FLSA because holding company identified itself as plaintiff's employer on plaintiff's W-2 tax form).

20

Because Diaz failed to prove that AutoZone, Inc., was her employer, Defendants' Point I is granted. The verdict and judgments rendered against AutoZone, Inc., are hereby reversed. In light of this disposition, we need not reach Defendants' Points V and VII.[23]

## C. Diaz made a submissible case for sexual harassment (Defendant's Points II and III).

Defendants challenge the trial court's determination that Diaz made a submissible claim for sexual harassment. A party alleging sexual harassment is

> tasked with establishing that: (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) this harassment affected a term, condition, or privilege of employment in a manner sufficiently severe to create an abusive work environment and (5) [the employer] knew or should have known of the harassment and failed to take proper remedial action.

*Lynn v. TNT Logistics N. Am. Inc.*, 275 S.W.3d 304, 308 (Mo. App. W.D. 2008). Defendants challenge only the fourth and fifth elements, arguing that Diaz did not prove that the harassment was sufficient to affect a term, condition, or privilege of her employment (Point II), or that AutoZoners, LLC, was aware of the harassment and failed to take prompt action when made aware (Point III).[24]

<u>The harassment affected a term, condition, or privilege of Diaz's employment.</u>

Defendants argue that Diaz failed to prove that any harassment that took place was sufficient to affect a term, condition, or privilege of her employment, in that she continued to successfully perform her job, did not require a leave of absence due to the conduct, and only

---

[23] In Defendants' Point V, they argue that the court erred in denying their motion for judgment notwithstanding the verdict on the ground that there was insufficient evidence to support a punitive damage award against AutoZone, Inc. In their Point VII, they argue that the court erred in denying their motion for new trial in that the verdict forms failed to identify specific conduct warranting punitive damages attributable to AutoZone, Inc., that differed from the conduct of AutoZoners, LLC. Because AutoZone, Inc., was not Diaz's employer, it cannot be held liable on Diaz's claims for either compensatory or punitive damages.

Further, in addressing other points, we will refer to arguments made by the "defendants" because the arguments were made to this court by both AutoZoners, LLC, and AutoZone, Inc. However, the remainder of these points are relevant only to AutoZoners, LLC, as AutoZone, Inc., is not subject to liability.

[24] "We review the denial of a motion for directed verdict by reviewing the evidence and all permissible inferences in the light most favorable to the plaintiff, and by disregarding contrary evidence and inferences." *Poloski v. Wal-Mart Stores, Inc.*, 68 S.W.3d 445, 448 (Mo. App. W.D. 2001).

sought medical treatment for symptoms arising from the harassment on a single occasion, and then only after she was transferred to a different store.

The primary flaw in Defendants' argument is that it overstates Diaz's burden to prove that the harassment affected a term or condition of the employment. Defendants imply that, absent a showing that Diaz's work performance dropped precipitously, or that she missed substantial work, she cannot show that harassment affected a term, condition, or privilege of her employment. This is not the case. "Sexual harassment creates a hostile work environment when sexual conduct either creates an intimidating, hostile, or offensive work environment *or* has the purpose or effect of unreasonably interfering with an individual's work performance." *Lynn*, 275 S.W.3d at 308 (emphasis added) (quoting *Barekman v. City of Republic*, 232 S.W.3d 675, 679 (Mo. App. S.D. 2007)); 8 C.S.R. § 60-3.040(17)(A)3 ("conduct of a sexual nature constitute[s] sexual harassment when . . . [s]uch conduct has the . . . effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment").

In a hostile work environment case, the question is "whether a reasonable person would objectively consider [the] behavior . . . severe enough to alter the conditions of her employment and create an abusive working environment." *Cooper v. Albacore Holdings, Inc.*, 204 S.W.3d 238, 245 (Mo. App. E.D. 2006). In order to meet this standard, "[t]he conduct must be sufficient to create a hostile work environment, both as it was subjectively viewed by the plaintiff and as it would be objectively viewed by a reasonable person." *Id.* at 244-45. "Once evidence of 'improper conduct and subjective offense' is introduced, it is largely up to the jury to determine if the conduct rose to the level of being abusive." *Lynn*, 275 S.W.3d at 308.

It is clear that Diaz's evidence as to AutoZoners, LLC, demonstrated both improper conduct and subjective offense. Diaz testified to conduct that went "beyond [] harmless

22

comments or boorish conduct." *Id.* It included repeated harassment that bordered on sexual assault, which the jury could have concluded was ignored when reported to AutoZoners, LLC. *See infra.* Accordingly, the jury was entitled to conclude, as it did, that the conduct created an intimidating, hostile, or offensive working environment, meeting the standard for this element.

Diaz also testified to the subjective effects that the conduct had on her. We are unaware of any standard requiring, as Defendants propose, that the harassment must require multiple trips to a doctor and repeatedly missing work. Nevertheless, Diaz did see a doctor, either while she was at, or mere days after leaving, the Truman Road location. Her doctor prescribed antidepressants due to the stress caused by the harassment. And Diaz testified that she "cried a lot, had really bad headaches, . . . got sick from being stressed all the time," that her "hair started falling out by the handfuls," and that Diaz's daughter walked into Diaz's room to find her cutting herself. These subjective manifestations were certainly sufficient for the jury to conclude that Diaz was negatively affected by the hostile workplace environment.

### AutoZoners, LLC, knew or should have known about the harassment and did not take prompt action.

Defendants next argue that Diaz failed to prove the fifth element of sexual harassment in that AutoZoners, LLC, did not know about the harassment and, when it found out about the harassment, it took prompt remedial action.

"The plaintiff establishes a primary element of a cause for sexual harassment where she can show that the employer *knew*, or should have known, *of the harassment* and *failed to take appropriate action.*" *Lynn*, 275 S.W.3d at 308. "An employer [knew or should have known] of sexual harassment if information about the harassment came 'to the attention of someone who (a) has under the terms of his employment, or (b) is reasonably believed to have . . . a duty to pass on the information to someone within the company who has the power to do something about

23

it.'" *Sims v. Health Midwest Physician Servs. Corp.*, 196 F.3d 915, 919 (8th Cir. 1999) (quoting *Young v. Bayer Corp.*, 123 F.3d 672, 674 (7th Cir. 1997)).

There was sufficient evidence to support a finding that Diaz timely informed AutoZoners, LLC, of the harassing conduct as it occurred. Diaz reported Mark's harassment to Williams as early as April of 2010, soon after the conduct began. And she continued to report every incident of unwanted physical contact to Williams. Defendants argue that this was insufficient to put AutoZoners, LLC, on notice because Williams was not Diaz's direct supervisor, and they fault Diaz for not going up the management chain when Williams's response was insufficient. But Brown, AutoZoners, LLC's regional human resources manager at the time of the conduct, testified that employees were told that they could report harassment to "anyone in management," which includes "commercial sales manager[s]," such as Williams. "If the employer has structured its organization such that a given individual has the authority to accept notice of a harassment problem, then notice to that individual is sufficient to hold the employer liable." *Weger v. City of Ladue*, 500 F.3d 710, 732 (8th Cir. 2007) (quoting *Williamson v. City of Houston, Tex.*, 148 F.3d 462, 467 (5th Cir. 1998)). Additionally, the record reflects that Williams was eventually terminated for his failure to report this conduct to higher management, reflecting that AutoZoners, LLC, believed Williams had a duty to report the conduct to higher management. In short, there was ample evidence for the jury to conclude that Williams was an employee who was authorized to receive complaints of harassment, thus providing notice to AutoZoners, LLC.

The record also supports the conclusion that, contrary to AutoZoners, LLC's assertions, Diaz did report the harassment to George, the store manager, immediately following the first inappropriate physical touching, and following each event thereafter. And when she did report

this harassment, George repeatedly told Diaz either that he would, or that Diaz should, "talk to Shane [Williams]," because the issues were with commercial customers.

There was also evidence sufficient to support a finding that AutoZoners, LLC, failed to take proper remedial action. It is undisputed that Williams did nothing to help prevent the unwanted harassment and, in fact, there was evidence that he occasionally encouraged it. Additionally, George, despite knowing of physical harassment as early as November 2010, did not report anything to Brown until January 2011. And even then, despite Diaz reporting conduct that bordered on sexual assault, George told Brown only that some customers had made "rude" comments, and then he inaccurately reported that the conduct had stopped a couple of weeks later. It was not until several months after the conduct was first reported to him that George made any effort to confront the customers responsible for the harassment. Moreover, when Diaz, dissatisfied with the lack of response by management, took it upon herself to contact Brown, it took multiple contacts, and months of time, before an investigation was initiated. By the time AutoZoners, LLC, transferred Diaz to another store, finally providing an effective remedy for the situation, it had been over a year since Diaz first reported unwanted harassment, and at least five months since she had reported inappropriate physical touching to the store manager. From this, the jury reasonably could have concluded that AutoZoners, LLC, did not take proper remedial action.

Defendants' Points II and III are denied.

**D. The trial court did not err in failing to submit vicarious liability as an element in jury instructions 7 and 8 (Defendants' Point VI).**

Defendants next argue that the trial court erred in submitting instructions 7 and 8 to the jury without additional language offered by Defendants.[25] Both instructions stated that the jury must find, as an element of Diaz's claim of sexual harassment, that Defendants "knew or should have known of the harassment and failed to take appropriate action." Defendants argue that these instructions "failed to submit the controverted fact of vicarious liability to the jury," because the instructions failed to clarify that Defendants must have acted "through one or more of [their] managerial employees who were acting within the scope and course of his or her employment with" Defendants in order to subject Defendants to vicarious liability. Defendants misunderstand the nature of Diaz's claim.

Where, as here, the claim alleges a discriminatory hostile work environment, "an employer's liability . . . is not based on an application of respondeat superior." *Wright v. Over-the-Rd. & City Transfer Drivers, Helpers, Dockmen & Warehousemen, Local Union No. 41, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 945 S.W.2d 481, 499 (Mo. App. W.D. 1997). Rather, liability is imposed when "the employer knew or should have known of the harassment and failed to take prompt remedial action reasonably calculated to end the harassment." *Id.* In other words, liability is imposed where the employer has violated its own, independent duty under the MHRA to maintain a work environment free from discrimination based upon any of its employees' protected classifications. *Meritor*, 477 U.S. at 66-67; *Mason*, 91 S.W.3d at 742. The employer's liability arises from the knowledge imputed from its supervisors because "the only way of communicating actual notice to a corporation," a

---

[25] "Whether a jury was instructed properly is a question of law this court reviews *de novo.*" *Bowolak v. Mercy E. Cmtys.*, 452 S.W.3d 688, 700 (Mo. App. E.D. 2014). "'Review is conducted in the light most favorable to the record,'" and "the party challenging the instruction [must] show that the offending instruction 'misdirected, misled, or confused the jury' and resulted in prejudice to the party challenging the instruction." *Id.* (quoting *Hervey v. Mo. Dep't of Corr.*, 379 S.W.3d 156, 159 (Mo. banc 2012)).

legal fiction that lacks sentience, "is through its agents." *Scrivner v. Am. Car & Foundry Co.*, 50 S.W.2d 1001, 1014 (Mo. banc 1932); *Green Tree Farm, Inc. v. Dir. of Revenue*, 10 S.W.3d 220, 224 (Mo. App. W.D. 2000) ("a corporation obtains its knowledge only through its officers and agent, thus information as to matters within the scope of the authority of its officers and agents is imputed to it"). But that is in no way the same as being held vicariously liable for the actions of the supervisors. *Williamson*, 148 F.3d at 465 ("employer liability for harassment by co-workers is direct liability for negligently allowing harassment, not vicarious liability for the harassing actions of employees").

Contrary to Defendants' assertion, vicarious liability was not at issue in the case. Rather, Defendants' own actions, or failures to act, were at issue. Accordingly, the trial court did not err in refusing to add Defendants' proposed language to the instructions.

Defendants' Point VI is denied.

**E. The trial court did not err in refusing to reduce the award of compensatory damage (Defendants' Point VIII).**

Defendants next claim that the trial court erred in denying their motion for remittitur, arguing that the jury's compensatory damage award should be reduced from $75,000 to $10,000 because it was not supported by substantial evidence. Defendants argue that Diaz "admitted that she did not seek medical treatment until after she left the Truman Road store and there was ample evidence that [Diaz]'s alleged emotional distress was not work-related."[26] Specifically, Defendants argue that the evidence showed that other sources of stress in Diaz's life, including moving a number of times, a turbulent relationship with her boyfriend, incidents of domestic

---

[26] Defendants also cite to a number of MHRA cases in which lower monetary awards have been awarded for compensatory damages, arguing that the verdict in this case is inconsistent with those cases. But Defendants never mentioned this theory in their point relied on, in which they point to only the purported lack of evidence supporting the damage award. "[A]n appellant abandons any claim of error as to an issue not raised in its points relied on in its appellant's brief." *Kabir v. Mo. Dep't of Soc. Servs.*, 845 S.W.2d 102, 103 (Mo. App. W.D. 1993).

abuse, a bankruptcy, an abusive childhood, and an abusive marriage, were the real reasons for any emotional distress.

"Intangible damages, such as pain, suffering, embarrassment, emotional distress, and humiliation do not lend themselves to precise calculation." *Van Den Berk v. Mo. Comm'n on Human Rights*, 26 S.W.3d 406, 413 (Mo. App. E.D. 2000). "Each case requires individualized contemplation and consideration by the trier of fact." *Id*. at 414. "Fair and reasonable compensation is the ultimate goal in awarding damages." *Id*. "We disregard all evidence and inferences that conflict with the verdict, . . . [and] will reverse the jury's verdict for insufficient evidence only if there is a complete absence of probative facts to support the jury's conclusion." *Blanks*, 450 S.W.3d at 365.

Evidence of the extent of Diaz's injuries, as set out *supra*, included: suffering very bad headaches, constantly being sick, experiencing a great deal of stress and anxiety, losing patches of hair, difficulty sleeping and eating, attempting to cut herself, becoming very angry, and having a doctor place her on antidepressant medication. Diaz testified that she dreaded going to work, and she attributed the problems listed above to the harassment that she was experiencing at work. Her doctor agreed. Defendants attributed the problems to other factors and had the opportunity to make that argument to the jury. Indeed, the jury may have accepted Defendants' explanation, at least in part, because Diaz argued that her damages were "$350,000 to $500,000," but the jury awarded only a relatively small fraction of that amount.

There is evidence supporting Diaz's claim that she was emotionally harmed, that the harm manifested itself in a number of physical and non-physical forms, and that it was attributable to the harassment that she endured at work. Viewing the evidence in the light most favorable to the verdict, as our standard of review demands, we cannot say that the jury's compensatory damage award is unsupported by substantial evidence.

28

Defendants' Point VIII is denied.

**F. The evidence was sufficient to support the jury's award of punitive damages against AutoZoners, LLC (Defendants' Point IV).**

In their fourth point on appeal, Defendants argue that the evidence was insufficient to support the jury's award of punitive damages against AutoZoners, LLC, because the evidence showed that AutoZoners, LLC, had a policy prohibiting sexual harassment, it provided training to employees regarding how to handle sexual harassment, and it responded promptly and successfully to Diaz's complaints. Diaz argues that AutoZoners, LLC, is attempting to rely on an inapplicable "good faith" defense.[27]

"Punitive damages require clear and convincing proof of a culpable mental state, either from a wanton, willful, or outrageous act, or from reckless disregard for an act's consequences such that an evil motive may be inferred." *Alhalabi*, 300 S.W.3d at 529. "Whether there is sufficient evidence to support an award of punitive damages is a question of law." *Id*. at 528. "[W]e view the evidence and all reasonable inferences in the light most favorable to submissibility and we disregard all evidence and inferences which are adverse thereto." *Id*. at 528-29.

Though we do not quarrel with AutoZoner, LLC's claims that it had a policy precluding discrimination, that it provided training to its employees on this topic, or that these facts might support a "good faith" defense to punitive damages under *Kolstad*, these facts are ultimately irrelevant to the question before us: whether Diaz presented a submissible case for punitive damages here. As discussed above, Diaz brought her claim as a negligence action; in light of this fact, the *Kolstad* "good faith" defense is inapplicable because "reasonableness rather than

---

[27] We review challenges to the sufficiency of the evidence de novo, accepting all facts and reasonable inferences in the light most favorable to the verdicts. *Blanks*, 450 S.W.3d at 364-65.

good faith is the standard by which negligence is to be determined." *Hiett v. Dir. of Revenue*, 899 S.W.2d 870, 873 (Mo. banc 1995).

Under the MHRA, "[a] submissible case [for punitive damages] is made if the evidence and the inferences drawn therefrom are sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity that the defendant's conduct was outrageous because of evil motive or reckless indifference." *Alhalabi*, 300 S.W.3d at 529. "Reckless disregard can be shown by evidence that an employer knew of the harassment and failed to adequately remedy the situation, or by evidence of the failure to properly investigate complaints of discrimination." *Hill*, 371 S.W.3d at 71 (internal citations omitted).

Here, Diaz argued that she was entitled to punitive damages not only because AutoZoners, LLC, failed to promptly and effectively remedy the harassment but also because AutoZoners, LLC, had an unwritten rule of nonenforcement of the anti-harassment policy when the alleged harassers were customers of the business. Diaz suggested that AutoZoners, LLC, valued profits over the safety and security of employees. To support her assertions, Diaz presented evidence that she repeatedly complained to both Williams and George about the harassment and that neither individual did anything to stop the harassment. Further, she presented evidence of discrepancies in the handling of investigations related to human resources versus those related to loss prevention. Diaz also presented evidence of an incident occurring in Wichita, Kansas, at another AutoZone store where AutoZoners, LLC, provided staff, wherein a commercial sales customer's employees assaulted a female AutoZone driver. That particular store continued to do business with the commercial sales customer to avoid losing profits. And as to the Truman Road location, Diaz presented evidence that Williams refused to respond to her complaints precisely because he did not want to lose commercial sales customers and that Mark believed nothing would be done to stop him from harassing her *because* he was a commercial

account holder. Finally, Diaz presented evidence that both Williams and George viewed her as a "problem child" and a "crybaby," suggesting that they did not take her complaints seriously.

"Recklessness and outrageousness may be inferred from evidence of . . . an employee's repeated complaints to supervisors fall[ing] on deaf ears." *Rowe v. Hussmann Corp*., 381 F.3d 775, 784 (8th Cir. 2004). Where the employer knows of abusive conduct, repeatedly fails to take effective action to stop the conduct, and defends or makes excuses for the conduct, the evidence is sufficient to support submission of punitive damages. *Id*. Here, Diaz repeatedly complained to both Williams and George and claimed that both individuals witnessed incidents of harassment; Williams repeatedly brushed off Diaz's complaints, excusing Mark's conduct by noting that Mark was "just a pervert" and encouraging Jimmy's conduct by remarking that Jimmy got to "grab her butt before [Williams] did." Though George reported that Diaz was having problems with some commercial accounts, he failed to report the nature of Diaz's complaints and told Brown that Diaz was the source of a lot of "drama" in his store. This evidence was sufficient to submit the issue of punitive damages to the jury.

Defendants' Point IV is denied.

### G. The punitive damage award against AutoZoners, LLC, did not violate due process (Defendants' Point IX).

In its ninth point on appeal, AutoZoners, LLC, argues that the trial court erred in denying its motion for remittitur of the punitive damage award. AutoZoners, LLC, claims that the $1,000,000 award is unconstitutionally large in violation of its right to due process.[28] We disagree.

---

[28] "Remittitur and a constitutionally reduced verdict, though potentially achieving the same result, are in theory different." *Blanks*, 450 S.W.3d at 412 n.71. "A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages." *Id*. "The court orders a remittitur when it finds that the jury's award is excessive and unreasonable on the facts." *Id*. (citing § 537.068). "In other words, the court may order remittitur relief when the jury awards a verdict that is simply 'too bounteous' under the evidence." *Id*. (quoting *Moore v. Missouri-Nebraska Exp., Inc*., 892 S.W.2d 696, 714 (Mo. App. W.D. 1994)). "A constitutional reduction,

"The rationale for permitting punitive damages is the furthering of society's interests of punishing unlawful conduct and deterring its repetition, and punitive damages are constitutionally permissible." *Peters v. Gen. Motors Corp.*, 200 S.W.3d 1, 25 (Mo. App. W.D. 2006). "The imposition of a punitive award implicates Fourteenth Amendment due process concerns," which "are both procedural and substantive."[29] *Id.* "Only when an award can fairly be categorized as 'grossly excessive' in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996). In determining whether an award is "grossly excessive," we generally consider the following factors: (1) the degree of reprehensibility of the conduct at issue; (2) the ratio of actual harm to punitive damages; and (3) the difference between the punitive damage award and the civil penalties authorized or imposed in comparable cases. *Id.* at 575. "The factor of comparative penalties is inconsequential," however, "in an MHRA case." *Brady v. Curators of Univ. of Mo.*, 213 S.W.3d 101, 111 (Mo. App. E.D. 2006). Thus, we will examine solely the first two factors.

<u>Degree of Reprehensibility</u>

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW*, 517 U.S. at 575. To determine reprehensibility, we consider whether:

> "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others;

---

on the other hand, is a determination that the law does not permit the award." *Id.* "Unlike a remittitur, which is discretionary with the court, a court has a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due-process clause." *Id.*

The distinction, though a fine one, affects our standard of review. The denial of a motion for remittitur is reviewed for an abuse of discretion, *Call v. Heard*, 925 S.W.2d 840, 849 (Mo. banc 1996), while "a constitutional challenge to a punitive damages award [is reviewed] *de novo*." *The Fireworks Restoration Co., LLC v. Hosto*, 371 S.W.3d 83, 91 (Mo. App. E.D. 2012). Here, the basis for Defendants' motion at trial and the substance of their argument on appeal involves a purely constitutional challenge; thus, we will review this claim de novo.

[29] AutoZoners, LLC's challenge relates solely to the substantive aspect.

the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an insolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."

*Estate of Overbey v. Chad Franklin Nat'l Auto Sales N., LLC*, 361 S.W.3d 364, 373 (Mo. banc 2012) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003)).

AutoZoners, LLC, argues that its conduct was not sufficiently reprehensible to justify the large punitive damage award. It argues that Diaz's harm was neither physical nor economic, that George and Brown credited Diaz's complaints and responded promptly and in good faith, and that there was no evidence of deceit by AutoZoners, LLC. Though it is true that Diaz's harm was neither physical nor economic, it was certainly emotional and psychological. And, contrary to AutoZoners, LLC's claim, the evidence supported a determination that neither George nor Brown acted promptly in response to Diaz's complaints. And, during this delayed response, Mark's conduct escalated, progressing from mere verbal comments to physical contact, potentially constituting sexual assault. Furthermore, while there was no evidence of deceit on behalf of AutoZoners, LLC, it overlooks the second factor of the reprehensibility analysis: whether its conduct evinced indifference or a reckless disregard to Diaz's health and safety. Mark's behavior became increasingly aggressive and had the potential to become dangerous to Diaz's health and safety. And as noted *supra*, there was sufficient evidence from which the jury could have found that AutoZoners, LLC, acted with reckless disregard for its employees' well-being by failing to remedy a hostile work environment, of which it was aware, in favor of maintaining commercial sales accounts (potentially a pattern of AutoZoners, LLC, as demonstrated from the Wichita incident),[30] or by not taking Diaz's complaints seriously, given

---

[30] Though due process does not allow an award of punitive damages based upon other parties' hypothetical claims against a defendant as part of the reprehensibility analysis, "due process does permit considering the wrongfulness of the conduct and whether it is part of a pattern and practice of misconduct." *Estate of Overbey v. Chad Franklin Nat'l Auto Sales N., LLC*, 361 S.W.3d 364, 373 (Mo. banc 2012).

the fact that she was labeled a "problem child" and a "crybaby." Thus, there was a sufficient degree of reprehensibility on the part of AutoZoners, LLC, to justify a sizeable award.

Ratio

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *BMW*, 517 U.S. at 580. The Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award." *Id*. at 582. "[L]ow awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, . . . the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Id*. "In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis." *Id*. at 583.

The ratio here of punitive to compensatory damages is roughly 13:1. AutoZoners, LLC, argues that ratios exceeding single digits are generally unconstitutional and urges us to remit the award to a 1:1 ratio. "While 'few awards exceeding a single digit ratio between punitive damages and compensatory damages . . . will satisfy due process,' greater ratios may 'comport with due process where a particularly egregious act has resulted in only a small amount of economic damages.'" *Lewellen v. Franklin*, 441 S.W.3d 136, 147 (Mo. banc 2014) (quoting *State Farm*, 538 U.S. at 425). Additionally, where the defendant's conduct was economically motivated and the defendant is a large corporation, or where the defendant is particularly recalcitrant, it very well may be that a large award is the only means by which to sufficiently ensure that its illegal conduct will be deterred. *See Barnett v. La Societe Anonyme Turbomeca France*, 963 S.W.2d 639, 666 (Mo. App. W.D. 1997) (defendant motivated purely by economic considerations), *overruled on other grounds by Badahman v. Catering St. Louis*, 395 S.W.3d 29,

40 (Mo. banc 2013); *Brady*, 213 S.W.3d at 111 (plaintiff had prevailed in three separate age discrimination suits against the defendant, and each time, the defendant's retaliation escalated); *Blanks*, 450 S.W.3d at 411 ("High-ratio punitive-damage awards are sometimes necessary in order to have a sufficient deterrent effect.").

Here, though the ratio exceeds single digits and Diaz's compensatory award was not as small as other awards justifying a higher ratio, we find AutoZoners, LLC's argument that Diaz was entitled to, at most, a 1:1 ratio unavailing. First, this argument ignores the Supreme Court's admonition that "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW*, 517 U.S. at 575. To accept AutoZoners, LLC's argument is to elevate the ratio analysis above the reprehensibility factor. Though a punitive damage award must be related to the harm caused, as noted above, the jury could have found, at best, that AutoZoners, LLC, was dismissive of Diaz's complaints because it viewed her as a "problem child," and, at worst, that Diaz's case was merely part of AutoZoners, LLC's pattern of valuing profits over the health and safety of its employees, as evidenced by the Wichita case.

Second, the jury could have determined that AutoZoners, LLC's conduct was motivated by purely economic concerns. And the evidence demonstrated that AutoZoners, LLC, was a large and financially well-off company. Thus, it very well may have felt that a large award was necessary in order to deter what it found to be AutoZoners, LLC's illegal conduct. In light of these factors, we cannot say that the punitive damage award against AutoZoners, LLC, was arbitrary so as to violate AutoZoners, LLC's right to due process.

Defendants' Point IX is denied.

**H. The punitive damage award did not exceed the statutory cap provided by § 510.265 (Defendants' Point X).**

In the tenth point on appeal, Defendants claim that the trial court erred in denying their motion for remittitur of the punitive damage awards because the awards exceeded the statutory cap imposed by § 510.265.[31] We disagree.

Section 510.265.1 provides that "[n]o award of punitive damages against any defendant shall exceed the greater of: (1) Five hundred thousand dollars; or (2) Five times the net amount of the judgment awarded to the plaintiff against the defendant." The "net amount of the judgment" is not limited to the amount of compensatory damages but instead includes all monetary awards to the plaintiff provided for in the judgment, such as attorneys' fees. *Hervey v. Mo. Dep't of Corr.*, 379 S.W.3d 156, 165 (Mo. banc 2012).

Here, in the judgment, Diaz was awarded $75,000 in compensatory damages, $243,826.25 in attorneys' fees, and $10,075.05 in costs, for a total award of $328,901.30. Five times this amount is well over the $1,000,000 punitive damage award Diaz received against AutoZoners, LLC. Thus, the punitive damage award against AutoZoners, LLC, did not exceed the statutory cap. Because we have already determined that AutoZone, Inc., was not a proper party to this action, we need not address Defendants' assertion that all punitive damage awards should be considered cumulatively for purposes of determining whether the statutory cap has been exceeded.

Defendants' Point X is denied.

**I. The trial court did not abuse its discretion in its award of attorneys' fees (Defendants' Point XI and Diaz's Point I).**

After trial, the court granted Diaz's initial motion for attorneys' fees, awarding her $243,826.25 in fees and assessing costs against Defendants in the amount of $10,075.05 (both

---

[31] The denial of a motion for remittitur is reviewed for an abuse of discretion. *Call*, 925 S.W.2d at 849.

sums representing the entire amount that Diaz requested in her initial motion). Following the denial of all of Defendants' post-trial motions, in a supplemental motion, Diaz sought an additional $32,097.50 in attorneys' fees and $703.98 in costs associated with responding to Defendants' post-trial motions. The trial court denied the supplemental motion, noting that its initial award of attorneys' fees and costs "took into account and included anticipated fees and costs related to post[-]judgment pleadings." Diaz, in her sole point on appeal, claims that the trial court erred in denying her supplemental motion for attorneys' fees. Defendants, in their final point, argue that the trial court erred in awarding $243,826.25 in attorneys' fees. Because these points present interrelated issues, they will be addressed together.

Defendants argue that the award of $243,826.25 was unreasonably high because both the hourly rate and the number of hours underlying the award were unreasonable. Defendants point to evidence they presented that they claim shows the reasonable market rates for similarly experienced civil rights attorneys in comparable cases range from $270 to $375 per hour; far less than the $400 to $475 per hour that was the basis for Diaz's fee request. Defendants also argue that the hours Diaz's attorneys submitted were unreasonable because Diaz voluntarily dismissed her claims against Smith, George, and Williams on the day of trial, and the jury returned verdicts against Diaz on her counts of retaliation. Accordingly, Defendants argue, because Diaz did not prevail either on the majority of her claims, or against most of the original defendants, the hours submitted should be reduced by at least 50%. In response to Defendants' arguments, Diaz points to affidavits she presented that she argues prove that the hourly rates her attorneys charged were reasonable. She also argues that the claims against Smith, George, and Williams, as well as the claims for retaliation, all "involved a common nucleus of facts which were inextricably related to one another." Thus, Diaz argues that there was no reason to award less than the fees requested.

37

In her single point on appeal, Diaz focuses on the trial court's alleged *denial* of fees for time spent responding to post-trial motions. Diaz argues that the trial court actually awarded her the full amount on her initial motion for fees and then refused to award any fees at all for the work performed post-trial. But that is inconsistent with what the trial court stated. In refusing to award Diaz any additional fees in response to her supplemental motion, the trial court noted that it had included in its initial attorneys' fee award some amount in anticipation of Diaz's counsel expending some time in responding to post-trial motions.[32] We take the trial court at its word, and therefore do not accept Diaz's mischaracterization of the trial court's award.[33] In evaluating the parties' claims, we will combine the two requests for fees, and compare the total amount requested to the amount awarded. Diaz requested a total of $275,923.75 in attorneys' fees. The trial court's award of $243,826.25 (a reduction of approximately eleven percent) was intended to fully compensate her for the cost of bringing suit, including responding to post-trial motions. The question for this court is whether the trial court abused its discretion in entering this award.

The MHRA "allows a court to award 'court costs and reasonable attorney fees to the prevailing party, other than a state agency.'" *Alhalabi*, 300 S.W.3d at 530 (quoting § 213.111.2). "The reasons are twofold: '(1) to fully make the plaintiff whole by compensating him or her for the costs of bringing suit and (2) to deflect that discrimination may result in nominal or small monetary damages.'" *DeWalt v. Davidson Surface Air*, 449 S.W.3d 401, 404 (Mo. App. E.D. 2014) (quoting *Coyle v. City of St. Louis*, 408 S.W.3d 281, 291 (Mo. App. E.D. 2013)). Courts have set forth a number of factors to be used in determining the appropriate amount of fees to award:

---

[32] We do not know the exact hourly rate or the number of hours awarded because the trial court did not make findings in support of the attorneys' fee award. While such findings would have been helpful to our review, neither party requested findings.

[33] This is not to say that such an anticipatory award is to be encouraged. Nevertheless, neither party has challenged the method as error.

(1) the rates customarily charged by the attorneys involved in the case and by other attorneys in the community for similar services; (2) the number of hours reasonably expended on the litigation; (3) the nature and character of the services rendered; (4) the degree of professional ability required; (5) the nature and importance of the subject matter; (6) the amount involved or the result obtained; and (7) the vigor of the opposition.

*Id.*

"'The determination of reasonable attorneys' fees is in the sound discretion of the trial court and shall not be reversed unless the amount awarded is arbitrarily arrived at or is so unreasonable as to indicate indifference and a lack of proper judicial consideration.'" *Tate v. AutoZoners, L.L.C.*, 363 S.W.3d 179, 182 (Mo. App. S.D. 2012) (quoting *Brady*, 213 S.W.3d at 114). "When dealing with an award of attorneys' fees, the trial court is considered an expert and may make an award at its discretion." *Id.* "Where there is no contrary showing, the trial court is presumed to know the character of the services rendered in duration, zeal, and ability." *Alhalabi*, 300 S.W.3d at 530.

"If the plaintiff's claims for relief are based on different legal theories and facts and counsel's work on one claim is unrelated to his work on another claim, the unrelated claims must be treated as if they had been raised in separate lawsuits, and, therefore, no fee may be awarded for services on the unsuccessful and unrelated claims." *Id.* "On the other hand, if the claims for relief have a common core of facts and are based on related legal theories and much of counsel's time is devoted generally to the litigation as a whole making it difficult to divide the hours expended on a claim-by-claim basis, such a lawsuit cannot be viewed as a series of distinct claims." *Id.* at 530-31. "[W]here a plaintiff's claims are related and [she] has obtained excellent results overall, [her] counsel should recover a fully compensatory fee that should not be reduced simply because [she] has not prevailed on every litigated claim." *Id.* at 531.

Here, the trial court reduced Diaz's total requested fee award by approximately eleven percent. Neither party has convinced us that the trial court did not properly take into consideration the necessary factors or that it abused its discretion in making the award that it did. The trial court acted within its discretion in making a modest reduction, to the hourly rate, *Hill*, 371 S.W.3d at 81-82 (trial court was within its discretion in awarding hourly rates ranging from $100 to $350 per hour, when counsel requested fees of $250 to $450 per hour), the number of hours billed, *Alhalabi*, 300 S.W.3d at 530-31 (trial court did not abuse its discretion in reducing number of hours billed by fifteen percent where plaintiff was successful on discrimination claim but not retaliation), or a combination thereof. *Tate*, 363 S.W.3d at 182 ("A trial court may attempt to identify specific hours that should be eliminated or may simply reduce the award to account for a prevailing party's limited success."). "While the trial court did not award the exact amount suggested by either party, there is no evidence that it abused its discretion by submitting an unreasonable or illogical award." *Id*. "The abuse of discretion standard gives us little room to second guess, even if we were so inclined, which we are not." *Grau Contracting, Inc. v. Captiva Lake Invs., LLC*, 429 S.W.3d 472, 477 (Mo. App. S.D. 2014).

However, on appeal we reversed the judgment against AutoZone, Inc. Because this represents a significant percentage of the initial judgment, we remand the issue of attorneys' fees to the trial court for further consideration in light of this opinion. This remand is not intended to suggest that this court has determined that the award of fees was excessive in light of the reversal of the judgment against AutoZone, Inc. Rather, we simply acknowledge that there has been a significant change to the amount of the judgment, which may have affected the trial court's fee award, and that the trial court is in a better position to evaluate whether this change should affect the award of fees. *Claus v. Intrigue Hotels, LLC*, 328 S.W.3d 777, 789 (Mo. App. W.D. 2010) ("trial courts are generally in a better position to take evidence and hear argument relating to

attorney fees"). Additionally, Diaz has filed a request for fees incurred on appeal, which the trial court shall determine on remand.

Defendants' Point XI and Diaz's Point I are denied. The issue of the proper award of attorneys' fees is remanded to the trial court for further consideration in light of this opinion.

**Conclusion**

Because Diaz failed to prove that AutoZone, Inc., was her employer, we grant Defendants' Points I, V, and VII. Defendants' remaining points are denied, as is Diaz's single point. The entire judgment as to AutoZone, Inc., is reversed, the awards of both compensatory and punitive damages against AutoZoners, LLC, are affirmed, and the case is remanded to the trial court for further proceedings as to attorneys' fees, consistent with this opinion.

Karen King Mitchell, Presiding Judge

Lisa White Hardwick and Anthony Rex Gabbert, Judges, concur.

41